**In re W. Craig JAMES, Debtor.**

No. 00–01873.

United States Bankruptcy Court,
D. Idaho.

March 6, 2001.

Randal J. French, Bauer & French, Boise, Idaho, for debtor.

Jed Manwaring, Evans, Keane, Boise, Idaho, for R. David Young.

Phillip K. Chattin, Boise, Idaho, for Susan Storey.

John Krommenhoek, Boise, Idaho, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background.

Craig James ("Debtor") filed a petition for relief under Chapter 13 of the Bankruptcy Code on July 28, 2000. John H. Krommenhoek ("Trustee") is the Chapter 13 trustee. Debtor's Amended Chapter 13 plan (Docket No. 54) is now before the Court for confirmation. Trustee and Creditors David Young ("Young") and Susan Storey ("Storey") object to confirmation of Debtor's plan.

A confirmation hearing concerning Debtor's original Chapter 13 plan, filed August 15, 2000, was held on December 7, 2000, at which the Court heard testimony and received evidence. Counsel for the parties provided oral closing arguments to the Court on December 20. At the conclusion of that hearing, the Court offered Debtor an opportunity to submit an amended plan. He filed that amended plan on December 22, 2000. Docket No. 54. Young and Storey then filed written

objections to Debtor's amended plan[1] (Docket Nos. 58; 59) and Debtor responded to those objections. Docket No. 60. Trustee's Findings and Recommendations were filed on February 26, 2001. Docket No. 71. The issues so raised were taken under advisement. This memorandum constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052; 9014. While the Court suspects that Debtor could propose a confirmable plan, for the reasons discussed below, the Court concludes it should deny confirmation of the present amended plan.

## II. Facts.

Debtor is an attorney who had practiced for several years in Boise. Debtor then decided to make a change. His financial difficulties arose from a business venture he and Storey, Debtor's former wife, undertook in 1994. Debtor quit the practice of law, and he, Storey and Young entered into a contract whereby Debtor and Storey agreed to operate Young's base camp for sailing vacations on the island of St. Vincent in the Caribbean. Soon after Debtor and Storey arrived in paradise, the parties' business relationship began to deteriorate and disputes arose concerning amounts of money owed and paid by the parties. By 1995, the business arrangement had terminated, Debtor and Storey had moved back to Boise, and Young had sued the pair for damages in Virginia state court.

The state court litigation has been a long, expensive, and for Debtor, ugly, experience. During its course, the Virginia court has imposed severe sanctions against Debtor. At one point, it fined him $20,000 and dismissed his counterclaims against Young with prejudice for engaging it what the state court concluded were discovery abuses. Debtor's Exhibits 30 and 24; Young's Exhibits B(5) and B(7). Debtor paid the fine. Young had requested further sanctions be imposed against Debtor and that motion was scheduled to be heard in Virginia on August 1, 2000. Debtor's Exhibit 41; Young's Exhibit D. In the sanctions motion, Young asked the state court to bar Debtor and Storey from introducing any evidence; requested entry of summary judgment concerning a promissory note and on all issues of liability; and sought recovery of thousands of dollars in attorneys' fees and costs from Debtor. Debtor's Exhibit 41; Young's Exhibit D. Debtor's bankruptcy filing intervened to stay any hearing on the motion. While a judgment on the merits has not been rendered in state court, Young has filed an unsecured proof of claim in this bankruptcy case for $303,418.98. Debtor disputes the validity of the claim.

After returning from the Caribbean, Debtor and Storey divorced. Under the provisions of their divorce decree, Debtor was ordered to indemnify Storey for a variety of the parties' debts, including any obligations arising from the litigation with Young. Docket No. 47, Decree of Divorce attached to Storey's Objection to Confirmation.

Since March of 1999, Debtor has held and used his brother's power of attorney (Young's Exhibit O) concerning a 1993 Toyota Camry allegedly owned by the brother, but in Debtor's possession. Initially, Debtor did not list the Camry on his Schedules, nor did he assert any legal or equitable interest in the vehicle. Following the hearing on this matter, Debtor amended his Schedules to show ownership of the Camry. Debtor has also provided for payment to his brother as a secured

---

1. Young's written objection was received on January 8, after the January 5 deadline set by the Court. Under the circumstances, Debtor was not prejudiced by this late filing, and Young's objection has been considered on the merits.

creditor for the car in the amended plan. Docket Nos. 56; 54. Debtor's approach to dealing with the car, and with his brother creditor's claim, in the bankruptcy case has been criticized by Storey and Young.

In addition, these creditors complain about Debtor's characterization of his living arrangement. Before filing for bankruptcy, Debtor entered into a rental agreement with an option to purchase a Boise residence. Young Exhibit G. Debtor thereafter transferred the purchase option to his girlfriend, Constance Marshall ("Marshall"). Marshall executed the option and purchased the residence in her name. Debtor lives in the home with Marshall and shares living expenses with her. Debtor asserts no ownership interest in the real property in his Schedules.

Debtor claims nearly all of his personal property is exempt.

Debtor operates his law practice [2] under an agreement with the law firm of Mauk & Burgoyne. He provides his services to the firm and its clients, and in return, shares in the income from the cases on which he works. The firm's 1999 profit and loss statement shows Debtor received $70,557.54 in income under this arrangement through December 17, 1999. Young's Exhibit E. Through October 31, 2000, Debtor had drawn $49,652.53 in income. Young Exhibit E. The 2000 Profit and Loss Statement shows Debtor draws about $5,000 per month. Young's Exhibit E. Debtor's Schedule I shows Debtor's

represents his net income to be $3,950 per month after deductions for taxes and other items of $550. Debtor's Schedule J itemizes living expenses totaling $2,195 per month.

Debtor's original Chapter 13 plan proposed that he make payments of $1,755 per month for 36 months, the minimum term allowed under the Bankruptcy Code. Debtor's amended plan proposes to extend the term of his plan to 48 months, and to increase the monthly payment amount to $2,000, effective in December, 2000. By the Court's calculation, Debtor proposes payments into his plan totaling $95,020.[3] The amended plan requires the Chapter 13 Trustee to pay administrative claims to Debtor's bankruptcy counsel of $18,058.46 for fees and costs, and $7,077.92 to Debtor Virginia counsel for postpetition services.[4] From what's left, the plan proposes payment on secured claims to Debtor's friend, Harold Morgan, in the amount of $1,539 for "storage fees" and to Debtor brother, Brent James, in the amount of $10,303.21 for the purchase of the Camry. Both of these claims were added to the plan following the hearings on this matter. In addition, Debtor proposes that $2,500 allegedly held by his accountant Reisse Perin in a trust account be surrendered to the accountant for payment of prepetition services. As near as the Court can tell, if the above amounts are paid as proposed, this leaves about $55,541 to pay Trustee's fees and tax claims,[5] leaving unsecured credi-

---

**2.** Since January 2000, Debtor has practiced through a professional corporation.

**3.** Debtor's original plan was filed August 15, 2000. Debtor was ordered to begin making payments to Trustee within 30 days. Docket No. 7. Presuming that Debtor did not make his first payment until September, Debtor has made 4 payments of $1,755 and proposes an additional 44 payments of $2,000, for a total of $95,020. Trustee report (Docket No. 71)

indicates that Debtor is current on plan payments.

**4.** By comparison, in their fee applications and affidavits, Debtors' attorney are requesting payment of $18,728.11 and $8,335.50 respectively. Docket Nos. 63 and 65. The Court has those applications under advisement pending resolution of confirmation issues.

**5.** According to Trustee, the I.R.S. has filed a priority claim for $21,296.62 and the State of

tors about $19,267.61 under the plan, assuming Debtor makes all the payments.

Trustee objects to confirmation of Debtor's amended plan on the basis that the plan does not comply with the requirements of Chapter 13 and other applicable provisions of Title 11 as required by Section 1325(a)(1), that the plan does not comply with Section 1325(a)(5) and that it is unknown whether Debtor will be able to make payments and comply with the plan. Young objects to confirmation of Debtor's proposed amended plan arguing it has not been proposed in good faith. 11 U.S.C. § 1325(a)(3). In addition to questioning Debtor's good faith, Storey objects contending Debtor fails to pay all of his disposable income into the plan. 11 U.S.C. § 1325(b)(1)(B).

### III. Discussion.

### A. Trustee's Objections.

Section 1325(a)(1) provides "the plan complies with the provisions of this chapter and with the other applicable provisions of this title . . . ." Trustee's report fails to discuss what particular provision of the Bankruptcy Code Debtor's plan violates. However, as discussed below the Court does find that Debtor fails to carry his burden that the plan has been proposed in good faith and that the plan fails to specifically provide that all disposable income shall be applied to the plan. In this respect, Trustee's objection is well taken.

 Section 1325(a)(5) provides several alternatives for the treatment of allowed secured claims under a Chapter 13 plan. One alternative, Section 1325(a)(5)(A), provides that the plan may be confirmed if "the holder of the such [secured claim] has accepted the plan . . . ." The case law makes clear that if the holder of an al-

lowed secured claim provided for by a plan fails to object to confirmation of the plan, Section 1325(a)(5)(A) is satisfied. *In re Andrews*, 49 F.3d 1404, 1409 (9th Cir.1995) ("Here, § 1325(a)(5) is fulfilled because subsection (A) was satisfied when the holders of the secured claims failed to object."). *See also In re Case*, 00.1 I.B.C.R. 44, 45 (Bankr.D.Idaho 2000) (stating that allowed secured claims may be properly dealt with under a plan in three ways, the first of which is if the secured creditor simply consents to the plan); *In re Brown*, 108 B.R. 738, 740 (Bankr.C.D.Cal.1989) ("As no mechanism for plan acceptance by [secured] creditors exists in a chapter 13 case (unlike in a Chapter 11 case where the creditors may vote for plan confirmation), acceptance is implied when an objection is not raised."). Here, no objection has been received from the holders of any allowed secured claims, and therefore Section 1325(a)(5)(A) has been satisfied.

Trustee reports that whether Debtor will be able to comply with chapter 13 and title 11 as unknown. To the extent this objection refers to the application of Debtor disposable income to the plan it will be discussed below. Otherwise Trustee gives no indication in his written recommendation as to why Debtor plan is not feasible. Additionally, the Trustee's other concerns about Brent James's proof of claim and the need to provide Trustee with some sort of mechanism to monitor Debtor's income will be discussed below.

### B. Good Faith.

Both Young and Storey cite Debtor's alleged lack of good faith as an objection to confirmation. Debtor insists the plan is a good faith attempt to deal with his financial predicament.

Idaho has filed a claim for $7,474.53 for unpaid taxes.

Under Section 1325(a)(3), Debtor must show his "plan has been proposed in good faith and not by any means forbidden by law." A Chapter 13 debtor's burden of proof to show his plan was proposed in good faith is particularly heavy when the debtor seeks to discharge debts otherwise excepted from discharge under Chapter 7 (the so-called "superdischarge"). *In re Padilla*, 213 B.R. 349, 352 (9th Cir. BAP 1997); *Fidelity & Casualty Co. of New York v. Warren (In re Warren)*, 89 B.R. 87, 93 (9th Cir. BAP 1988). The term "good faith" is not defined in the Code or explained in the statute's legislative history. *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1389–90 (9th Cir.1982). In determining whether a plan has been proposed in good faith the bankruptcy court must consider the totality of the circumstances including the debtor's prepetition conduct. *550 W. Ina Road Trust v. Tucker (In re Tucker)*, 989 F.2d 328, 330 (9th Cir.1993). Good faith is determined on a case-by-case basis. *Goeb*, 675 F.2d at 1390. *Goeb* instructs the bankruptcy court to "inquire whether the debtor misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code or otherwise proposed his Chapter 13 plan in an inequitable manner," but does not attempt to specify a comprehensive list of relevant factors to consider in making its decision. *Id.* Over the years, the bankruptcy courts have used a number of other factors in determining whether the debtor has proposed a plan in good faith including:

1) The amount of the proposed payments and the amounts of the debtor's surplus;

2) The debtor's employment history, ability to earn, and likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8) The existence of special circumstances such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11) The burden which the plan's administration would place upon the trustee.

*Warren*, 89 B.R. at 93; *In re Lindsey*, 95 I.B.C.R. 142, 146 (Bankr.D.Idaho 1995).

Under these standards, Debtor and the objecting creditors each argue their positions persuasively. In this case, a mechanical application of these factors is impossible, since many of the indicia of good faith are present, while others are not. For instance, while it came late, Debtor proposes a 48 month plan providing for substantial payments to his creditors. This proposal exceeds the minimum required by the Code. *See* 11 U.S.C. § 1322(d) (providing, in effect, that the plan shall provide for payments over 36, but not more than 60 months). On the other hand, the Court has been disappointed in Debtor's conduct and candor both before and after commencement of the bankruptcy case. At bottom, confirmation of a debtor's Chapter 13 plan is a matter committed to the discretion of the bankruptcy judge. *Warren*, 89 B.R. at 90. Af-

ter considering the totality of the circumstances presented in this case, and while it is a close call, in the exercise of its discretion the Court concludes Debtor has failed to carry his burden of proving that his amended Chapter 13 plan has been proposed in good faith. Some of the particular reasons for the Court's conclusion are discussed below.

### 1. Term of the Plan and Payment Under the Plan.

As noted, Debtor plan proposes payment for a total of 48 months. This exceeds the 36 month minimum required by the Code. So, too, it falls short of the 60 month maximum plan term. As stated above, under the amended plan, Debtor proposed to pay $95,020 to the Trustee. Based upon the Court's general experience in Chapter 13 cases, this is a substantial sum. Through the amendment Debtor made to his plan, he proposes to pay an additional $245 for the remaining 32 months of the plan, which increases total plan payments by $7,840. In addition, extending the plan by an additional 12 months increases the amount paid to creditors by $24,000. Debtor's extension of the plan and substantial payment to creditors under the plan is indicative of Debtor good faith. However, the Court is compelled to consider the totality of the circumstances.

### 2. Debtor's Candor with the Court and Accuracy of Debts and Expenses.

### a. Debtor's Failure to Disclose Assets.

Debtor can be justifiably criticized for failing to fully and accurately account for his assets. As mentioned above, Debtor's original Schedule B did not mention any interest in the 1993 Toyota Camry. Debtor has apparently used and maintained this car since at least March of 1999. Debtor holds a power of attorney "to do

any and all acts and to execute any and all instruments on [behalf of Brent James] as may be necessary and appropriate in the titling and registration" of the car. The car was registered in Brent James's name by Debtor in care of Debtor's address. Debtor testified that he pays for the day to day expenses of operating the car, but his brother maintains the insurance. Following the evidentiary hearing on the original plan, and after considerable cross-examination of the Debtor by Young's counsel concerning the status of the car, Debtor amended Schedule B to include it as his asset. Docket No. 52. Debtor also amended Schedule D to list Brent James as a creditor holding a secured claim. Docket No. 56. While Debtor originally claimed no ownership of the car, and that he was simply "using" his brother's vehicle, Debtor's amended plan proposes to pay his brother a total of $10,303.21 on account of the car. The Court suggests this approach evidences at best a lack of candor with the Court and creditors concerning this Camry. At worst, Debtor's conduct amounted to an attempt to conceal what is equitably, if not legally, Debtor's ownership of the auto.

Debtor also proposes payment of a secured claim to Harold Morgan ("Morgan") of $1,539.60 in his amended plan, a provision not found in the original plan. Debtor testified that Morgan was a friend who was storing Debtor's personal possessions in the Caribbean. The collateral for Morgan's claim allegedly includes a stove, bed, refrigerator, chairs, books and clothing. Docket No. 56. None of these assets were listed in Debtor's schedules until after the evidentiary hearing. Docket No. 52.

■ Also, following his testimony at the hearing that Debtor left a 1973 Fiat automobile in the Caribbean, that car was added to Debtor's Schedule B. Docket No. 52. His amended Schedule B values the

car at $50, and he has claimed it as exempt. To be fair, Debtor testified he considered the car near worthless because the passenger compartment of the car is apparently "rusted out", and it may well be that the cost of shipping the Fiat to Boise may exceed its value. However, a debtor is duty-bound under the Code to submit an accurate schedule of assets to the court. 11 U.S.C. § 521(1). Schedule B is clear in requiring the debtor to list all personal property. Even items perceived to have no substantial value should be disclosed.

Based on these and other transgressions, the objecting creditors are correct in arguing Debtor has not been completely forthright in disclosing his assets. Viewed individually, Debtor's omissions may seem insignificant. Collectively, they give the Court cause for concern. In three different instances Debtor originally omitted property from his sworn schedules, only to amend them after his alleged "oversight" came to light. On the scales described in the case law, this is a factor which weighs against finding Debtor has proposed his plan in good faith.

### b. Debtor's Living Expenses

Debtor does not own the home he shares with Marshall. As stated above, Debtor originally entered into a rental agreement with an option to purchase the residence. Debtor represents he was unable to obtain financing to exercise the option, so he transferred this option to Marshall, who then purchased the house.

Debtor's Schedule J, his list of monthly expenses, shows he pays $505 per month for rent or mortgage expenses. Docket No. 5. However, the evidence produced at the hearing contradicts Debtor's Schedule J. Young's Exhibit H includes a series of checks each in the amount of $1,011.24, signed by Debtor and payable to a mortgage lender which were written after Debtor filed his bankruptcy petition and after Debtor and Marshall allegedly separated their finances.[6] Debtor testified that he paid the housing expenses for himself and Marshall and that he and Marshall share living expenses about equally. Debtor did not provide any details about how this sharing of expenses takes place. If Debtor's testimony is taken as true, then Marshall would have to offset Debtor's living expenses by $506 per month. Debtor introduced no specific evidence showing that Marshall offsets Debtor's expenses by $506 per month. On the other hand, Young has introduced evidence calling Debtor's testimony into doubt.

Young's Exhibit U is an analysis of Debtor's bank account prepared by Young.[7] Young relied on Debtor's bank statements and canceled checks in preparing this analysis. Even if not precise in every detail, the Court finds this exhibit somewhat useful in analyzing Debtor's living expenses.

Exhibit U includes a compilation of income and expenses from January 1997 to August 2000 grouping Debtor's and Marshall's income and expenses into a number

---

**6.** Young's Exhibit I includes Check No. 3681 for $2,000 signed by Marshall on August 4, 2000 payable to Key Bank. Debtor testified he and Marshall split their finances shortly after he filed for bankruptcy. It appears from the record that Marshall used this check to open her own account.

Young's Exhibit H includes Check Nos. 3704, 3719 and 3727 each for $1011.24 signed by Debtor payable to Chase Mortgage.

The checks are dated September 1, 2000, October 2, 2000 and November 2, 2000.

**7.** Young testified that he was a chartered accountant in the United Kingdom for eight to nine years before leaving for the United States. Additionally, Young testified he has always done the accounting and bookkeeping of his own businesses.

of categories; similar analyses for 2000, 1999, 1998 and 1997; and a detail describing the specific expenses for each category. For example, the first category of expense was "Bogus Basin Road" and the first three expenses relating to this category were A1 Heating for $92, Accent Window Tinting for $387 and Alliance Title and Escrow for $8,272.

Young's brief testimony concentrated on the first page of Exhibit U which is a compilation of income and expenses from January of 1997 to August of 2000.[8] Young identified three categories of expenses as living expenses: "Bogus Basin Road" which includes rent and mortgage payments and expenses related to the home such as utilities bills; "Constance Marshall" which is checks signed by Constance Marshall; and "Debit Card" which is debit card charges. Young also identified Debtor's and Marshall's sources of income as "Mauk & Burgoyne Drawings" which is Debtor's income; and "CGM Pay" which is Marshall's income.

There are some problems with this exhibit. First, Marshall moved to Boise in May of 1998; obviously she could not have shared living expenses with Debtor before that time. An analysis of all of Debtor's and Marshall's living expenses from January 1997 to August 2000 would naturally show that Debtor paid a greater share of the expenses because Marshall did not live with Debtor for roughly 17 months during that time period. Also Young testified that he did not have a bank statement from November of 1997 and was missing a page from a May bank statement of an unspecified year.

However, the analysis showing income and expenses during 1999 and 2000 are helpful in analyzing Debtor's living expenses for those years, at least in regard to the income and expenses identified during Young's testimony.[9] Through August of 2000, Debtor's Mauk & Burgoyne draws were $39,000 and Marshall's CGM pay was $12,719.20. Expenses for Bogus Basin Road, Constance Marshall and Debit Card totaled $28,693.68. Marshall's income was less than half of these living expenses. In other words, according to this analysis, Debtor must have paid a greater share of these expenses than did Marshall.

For 1999 Debtor's Draws were $64,441.23, and Marshall's pay was $23,855.06. Expenses for Bogus Basin Road, Constance Marshall and Debit Card totaled $59,267.23. Again Marshall's income was less than one half of the living expenses, and so Debtor must have paid a greater share of their living expenses in

---

8. Exhibit U purports to show an analysis of Debtor and Marshall's income and expenses from January 1997 to December of 2000. Young testified that this analysis only covered income and expenses through August of 2000.

9. The only other item listed as income for 1999 and 2000 is Customer Deposit. No detail explains what is meant by Customer Deposit.

Other expenses included in Exhibit U for 2000 are AAA, Brent James, Idaho State Tax, Internal Revenue Service, New York Life, attorney's fees to Debtor's bankruptcy and Virginia counsel, Reisse Perin and Craig James Expenses. For 1999 there were additional expenses for Dennis Gibala and Walkers Car Company.

The Court has no doubt that some expenses such as Debtor's attorney's fees should not be included in analyzing the sharing of living expenses by Debtor and Marshall. But, other expenses such as those identified as AAA, New York Life and Craig James Expenses could be characterized as living expenses. The Court will consider only the income and expenses identified in Young's testimony in analyzing Debtor's sharing of living expenses with Marshall. There is an insufficient factual record to include items outside of Young's testimony in this analysis.

1999 as well.[10]

The Court does not find Young Exhibit U as conclusive evidence from which the exact proportion of living expenses paid by Debtor and paid by Marshall can be determined. On the other hand, when the Court views this evidence together with the fact that Debtor pays twice the amount he has scheduled for housing expense, and that Debtor has made no specific showing that Marshall offsets $506 in his living expenses, this shows Debtor's testimony that he pays only half of the living expenses is unreliable.

The Court appreciates that Debtor and Marshall are not husband and wife, and as a result, Marshall's income has not been taken into consideration concerning whether Debtor's plan is properly funded. However, Debtor is obliged to show that his monthly living expenses are reasonable and that he pays no more than his proportionate share under his informal relationship with Marshall. At this point, no such showing has been made, and the Court can not find that Debtor is exhibiting good faith in the amount of payments that he proposes to pay his creditors under the Chapter 13 plan. This is another reason the Court concludes Debtor has failed to carry his burden.

### c. Brent James's Proof of Claim.

Brent James, Debtor's brother, filed a proof of claim for $78,000 for goods sold and money loaned to Debtor. Brent James asserts his claim is secured in the amount of $13,500 representing the sale price for the Toyota Camry. The remaining $64,500 he asserts to be a priority unsecured claim. A spreadsheet attached to the proof of claim describes the date and amount of the various loans made by

Brent James to Debtor. The car was apparently transferred to Debtor in March of 1999. This is the most recent debt incurred to Brent James. Among a number of checks Brent James wrote to Craig James, Storey and to Debtor's Virginia counsel is Check No. 529 payable to Craig James in the amount of $10,000, dated February 27, 1995. Also Young's Exhibit Q lists what Debtor described as a loan from Brent James in the amount of $20,000. Debtor's amended Schedule D (Docket No. 56) shows a claim of $76,000 owed to Brent James, $9,000 of which is secured (for the sale of the Camry), with the remaining $67,000 unsecured. There is evidence in the record calling the validity of this claim into question.

Storey testified that while she and Debtor were living in the Caribbean, Brent James had loaned them $10,000 or $15,000, but that they were not obligated to pay this loan back. Young's Exhibit P is an offer in compromise signed by Debtor on December 30, 1999 under the penalty of perjury which was submitted by Debtor to the Internal Revenue Service in an attempt to settle Debtor's tax liability for 1994. Section IV of this document contains a list of his assets and liabilities. The only debt listed by Debtor as owed to Brent James is a $16,000 note payable. This $16,000 balance allegedly reflected $4000 in payments Debtor had made to his brother on the debt.

This state of the record is problematic. Debtor's bankruptcy schedules, also executed under penalty of perjury, list debts owed to Brent James for $76,000 with $9000 due for the Toyota Camry, and an additional $67,000 in unsecured debt. This is a far cry from Debtor's account made to

---

10. The Court has scrutinized the detail describing each category of expenses to be sure that no expenses were double counted.

the I.R.S. some months earlier that he owed only $16,000 to his brother. Since Debtor has not objected to Brent James' proof of claim, he evidently intends that his brother share as an unsecured creditor to the extent of the full $67,000 claimed. On this record, the Court can only wonder what amount Brent James is truly owed; whether Debtor's statements to the I.R.S. or his bankruptcy schedules are inaccurate, or worse, false; and whether there is mischief afoot designed to allow Brent James to receive a larger share of payments made under Debtor's plan than appropriate. This is another factor persuading the Court to conclude that Debtor has not shown his Chapter 13 plan has been proposed in good faith.[11]

### 3. Preferential Treatment of Creditors.

Debtor's plan proposes to pay the full amount due on the secured claims of Morgan ($1,539.60) and Brent James ($10,-303.21). Debtor also wants to turnover $2,500 to Perin. Debtor will also pay more than $25,000 to his two attorneys in administrative expenses. Obviously, the Court should not fault Debtor for what creditors have submitted in their proofs of claim.

However, in judging his good faith, the Court must consider Debtor's treatment of those claims under his proposed plan.

Debtor's attorney prepared Morgan's proof of claim,[12] and so presumably Debtor will not contest its allowance. Recall, Morgan allegedly stored some of Debtor's personal property in St. Vincent. No evidence has been presented showing Morgan holds a perfected lien or security interest in any of Debtor's property. Debtor argues that Idaho Code § 28–9–203(1)(a) and § 45–805(a) provide a statutory basis for liens in favor of a third party who has possession of property of the debtor. No explanation is given by Debtor why Idaho law should apply to Morgan's claim, and in fact Debtor seems to concede in his briefing that it does not. Debtor believes it cost effective to simply pay the secured claim as opposed to incurring attorney fees to determine whether St. Vincent law supports allowance of a secured claim under the Code.[13]

Brent James's proof of claim asserts the Camry secures a debt of $13,500. No security agreement is attached to the proof of claim demonstrating the sale transaction included a consensual security interest.[14]

11. The Court does not here attempt to adjudicate whether Brent James's proof of claim should be allowed. Rather, the issue before the Court is Debtor's good faith. In conducting this inquiry and evaluating Debtor candor, it really matters less what Brent James is actually owed, than why the parties present two statements, sworn by Debtor to be true, but conspicuously inconsistent.

12. Under Fed.R.Bankr.P. 3004 a debtor may file a proof of claim for a creditor within 30 days after expiration of the time for filing claims prescribed in Rule 3002(c) or 3003(c) in the event the creditor fails to file a claim. In Chapter 13 cases, a creditor must file a proof of claim not later than 90 days after the first date set for the meeting of the creditors under Section 341(a), which in this case occurred September 8, 2000. Fed.R.Bankr.P.

3002(c). Debtor timely filed the Morgan proof of claim on December 21, 2000.

13. Curiously, Debtor does not discuss whether surrendering the stored goods to Morgan as allowed by Section 1325(a)(5)(C) would be the most cost effective approach to this alleged claim.

14. Debtor's response indicates that the car was included as a secured claim to address and defuse what the Court perceived as a "non-issue." More correctly, what the Court perceived as the "non-issue" in this case was whether title to the car passed to Debtor under his agreement with Brent James, and therefore the Toyota should be disclosed as Debtor's asset, despite the fact that Brent James is still the registered owner. Brent James's proof of claim indicates the he sold

Likewise, there is no evidence that Brent James perfected his purported security interest in the car. Debtor testified at the hearing that he feels his brother should be paid for the car, and his amended plan treats Brent James as a secured creditor.

Debtor's plan also provides for the turnover of $2,500 to Reisse Perin, Debtor's long-time accountant. This $2,500 was among funds Debtor gave Perin from the proceeds of a real estate sale in trust so Perin to use in pursuing a settlement of Debtor's obligations to the Internal Revenue Service. Debtor does not know if Perin still retains the trust funds, but feels that because of the small amount involved, Perin should be allowed to apply this money to his outstanding bills for accounting services. Again, there is nothing in the record to show Perin holds an enforceable interest in the money.

Despite the dubious status of all these secured claims, Debtor opposes none of them, and his plan proposes to pay these claims in preference to unsecured claims, including those of Young and Storey. The alleged secured creditors are Debtor's friend, his brother and his accountant. If Debtor is proceeding in good faith, his approach to his secured creditors' claims are both perplexing and disquieting. This presents another factor suggesting that good faith is lacking here.

### 4. Debtor's Conduct in Virginia Litigation.

Prepetition conduct is a factor in measuring a Chapter 13 debtor's good faith. *Tucker*, 989 F.2d at 330; *Goeb*, 675 F.2d at 1390. Additionally, it is well established that a Chapter 13 plan is not sub-

mitted in good faith if filed primarily for the purpose of avoiding the outcome of state court actions. *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir.1994) ("Bad faith exists where the debtor only intended to defeat state court litigation."); *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1445 (9th Cir.1986) (upholding bankruptcy court's finding that debtor's plan lacked good faith where the real purpose of the plan was to avoid a creditor's state court specific performance action). *See also Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir.1999) (listing debtor's intent to avoid state court litigation as a factor in dismissing Chapter 13 cases for lack of good faith). These authorities come to bear on this case.

Debtor indicates that his involvement in the Virginia law suit was a financial burden. He says the litigation sapped his resources and taxed his income, both in terms of the time spent away from work to deal with the litigation, and because of the attorney's fees incurred in defending the action. Debtor's Amended Schedule F (Docket No. 26) indicates that he owes $33,645 to the attorneys who represent him in Virginia. Moreover, a substantial portion of any monies borrowed from Brent James was for the purpose of funding the litigation. It came to be too heavy a burden to bear, Debtor testified he filed for bankruptcy to bring the drain on his time and assets to an end.

The Court acknowledges that seeking relief from the costs of litigation can represent a proper basis for bankruptcy relief, and doing so is not necessarily indicative of a lack of good faith. *See In re Elisade*, 172 B.R. 996, 1001 (Bankr.

---

the car to Debtor. Under Idaho Code § 28–2–401(2), unless otherwise explicitly agreed, "title passes to the buyer at the time and place the seller completes performance with reference to physical delivery of the goods,

despite any reference to a security interest...." Once again, it is the Debtor's candor, not his legal arguments, that constitute one measure of his good faith.

M.D.Fla.1994). However, the Court is also aware that, in this context, the provisions of Chapter 13 can be abused as well. *In re Pickering,* 195 B.R. 759, 765 (Bankr. D.Mont.1996); *In re Limbaugh,* 194 B.R. 488, 491 (Bankr.D.Or.1996).

While Debtor insists otherwise, based on the record, it appears many of the financial injuries suffered by Debtor in the Virginia litigation have been self-inflicted. Debtor was fined $20,000 and his counterclaims were dismissed because the Virginia court concluded Debtor has engaged in discovery abuses. A motion for imposition of further sanctions against Debtor was scheduled for August 1, 2000. Debtor's Chapter 13 petition was filed July 28, 2000. Debtor testified he had serious concerns about the pending motion, and apparently with good reason. As stated above, the penalties sought by this latest sanction motion included barring Debtor and Storey from introducing any evidence in the action, and the entry of a summary judgment against Debtor and Storey on all issues of liability. The Virginia court had suggested these remedies may be appropriate at an earlier hearing. Debtor's Exhibit 41; Young's Exhibit D.

While seeking the shelter of bankruptcy relief in the face of overwhelming litigation costs can sometimes be justified, this is not such a classic case. Here, Debtor has filed for bankruptcy because the prospect loomed that he would lose in state court largely because of his own misconduct. Unlike those situations where the inevitable costs of prevailing on the merits outweighs the sense of going forward, Debtor has authored his own demise, and the Court concludes that Debtor has not shown, when all circumstances are considered, that his resort to Chapter 13 is consistent with good faith.

There is another reason Debtor's conduct in the Virginia action is worrisome. While Debtor now seeks protection from the financial burdens of funding the state court action, such was not always his intent. Right after filing his bankruptcy petition, Debtor's Virginia lawyers removed the litigation to the United States District Court for the Eastern District of Virginia. A short time later, Debtor sought the approval of this Court to use property of the estate to retain attorneys in Virginia to oppose Young's motion for remand to the Virginia state court. Docket No. 20. If he were successful in opposing Young's motion to remand the litigation to the state court, Debtor indicated he intended to seek the transfer the litigation to the Idaho Bankruptcy Court. Docket No. 20.[15] As noted above, Debtor has incurred over $7,000 in legal fees for services provided after filing for bankruptcy in connection with this strategy. In other words, as contrasted to using bankruptcy to put an end to the financial drain of supporting this action, Debtor intended to continue the fight, only in the Idaho Bankruptcy Court instead of the Virginia state court. Examined closely, Debtor's bankruptcy petition could be seen not as a sincere request for financial relief, but instead as a litigation tactic to obtain a transfer of the action to a friendlier, or at least more convenient, forum and venue. If so, this hardly amounts to good faith.

## 5. Indemnification of Storey.

Young and Storey also feel Debtor is guilty of bad faith because by seeking re-

---

**15.** In connection with the removal and remand Young moved this Court for stay relief in order to prosecute the remand motion in the Virginia federal court. To avoid the expense of this litigation, this Court denied Debtor's motion for use of property of the estate to pay his lawyers and Young's motion for stay relief pending further proceedings in this case. Docket No. 28.

lief under Chapter 13, Debtor could receive a "superdischarge" and will be relieved from his obligation to indemnify Storey against Young's claims. *See* 11 U.S.C. § 1328(a). The Court has not determined whether Debtor obligations to Storey arising from the indemnification provisions of the divorce decree would be, as Storey contends, nondischargeable in a Chapter 7 case under Section 523(a)(15).[16] However, it is clear that if Debtor were to confirm and complete a plan, he would be entitled to a discharge of all debts except those of the kind identified in paragraphs (5), (8) or (9) of Section 523(a). 11 U.S.C. § 1328(a)(2). Storey's indemnity obligation does not seem to be the type covered by Section 523(a)(5), (8) or (9).

■■■ Alone, a Chapter 13 debtor's desire to take advantage of the broader discharge does not necessarily rise to the level of bad faith. *See e.g., Lawrence Tractor Co. v. Gregory (In re Gregory),* 705 F.2d 1118, 1121 n. 4 (9th Cir.1983); *Warren,* 89 B.R. at 93–94; *In re Paulsen,* 1995 WL 128473, at *1 (Bankr.D.Idaho 1995). However, when viewed together with the other facts surrounding Debtor proposed Chapter 13 plan, the Court is concerned with the outcome. Storey testified she is employed as a retail clerk and earns less than ten dollars per hour. She has no ability to defend her interests in the Virginia litigation, particularly without Debtor's cooperation and financial support. Confirmation of Debtor's plan under these circumstances renders Storey completely vulnerable to Young's claims, and dooms her to financial failure. Again, under the facts of this case, this is another reason why Debtor's plan is not proposed in good faith.

### 6. Debtor's Plan Is Not Proposed in Good Faith.

As observed above, any determination concerning a debtor good faith is based upon a review of the totality of the circumstances. The debtor bears the burden of proof. The Court must exercise its discretion in weighing the various facts, circumstances and evidence. Given the proposed plan, the scales tip against Debtor.

In isolation, perhaps none of the concerns identified above should prevent Debtor from confirming a Chapter 13 plan. The Court believes the 48 month term of the plan and the substantial amounts to be paid creditors under the plan is indicative of good faith. But, several factors weigh heavily against Debtor.

Debtor's filings with and representations to this Court lack candor. Debtor failed to properly disclose and schedule his assets until his omissions became an issue. The evidence of Debtor's payments for his living expenses contradicts the budget offered in his sworn schedules; in fact, Debtor has made no specific showing of how he and Marshall share living expenses. Debtor's plan prefers the claims of his friend, brother and accountant to those of other creditors despite a lack of evidence that these claims deserve such

---

16. No determination under the balancing test of Section 523(a)(15) has been made here. Under Section 523(a)(15) debts incurred by the debtor in the course of a divorce not in the nature of alimony, maintenance or support of the debtor spouse or children are not discharged unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor....

treatment. Debtor abused the judicial process in the Virginia court, and Debtor's bankruptcy petition was arguably filed primarily to avoid imposition of further sanctions for his conduct there. Finally, Debtor chose Chapter 13 so that his obligation to indemnify Storey will be discharged, even though his debts to her may not be dischargeable in a liquidation setting, and may financially ruin her.

In the exercise of the Court discretion, the Court concludes Debtor has not shown he has filed his proposed plan in good faith as required by Section 1325(a)(3).

## C. Disposable Income.

While the Court concludes confirmation of Debtor's plan should be denied for the reasons stated above, there are other issues presented in this case meriting the Court's consideration.

 Storey objects to confirmation of Debtor's plan because he fails to commit all of his disposable income to making payments into the plan as required by Section 1325(b)(1)(B).[17] For the purposes of Section 1325(b), disposable income means that income received by the debtor which is not reasonably necessary to be expended "for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2). The debtor need only apply all of his projected, not actual, disposable income to the plan. *Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355, 358 (9th Cir.1994). The objecting party bears "the initial burden of producing satisfactory evidence to support the contention that the debtor is not applying all his disposable income" to the plan. *In re Heath*, 182 B.R. 557 (9th Cir. BAP 1995) quoting *Education Assistance Corp. v. Zellner (In re Zellner)*, 827 F.2d 1222, 1226 (8th Cir.1987). The burden then shifts to the debtor to show that all disposable income is being committed to the plan. *Id.*

Storey sets forth two arguments to show Debtor is not committing all his disposable income to the plan. First, she argues that Debtor plan does not specifically provide that all disposable income is committed to the plan. Second, she contends Debtor is undercompensated in his present position, or is deliberately earning less than he reasonably could.

### 1. Plan's Commitment of Disposable Income.

Debtor plan states he will pay income to the trustee "as is necessary for the execution of the plan...." This provision is consistent with Section 1322(a)(1), requiring a plan to "provide for submission of all or such portion of future earnings or other future income of the debtor to the supervision of and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1). Also, under this Court's General Order No. 146, Chapter 13 plans must substantially conform to the form adopted by the Court. The language from Debtor's plan is the same as the form Chapter 13 plan.

 "A provision specifying that all disposable income is being paid to the plan is not mandatory in all circumstances." *J.R. Hollister Co. v. Jackson (In re Jack-*

---

**17.** If the trustee or the holder of an allowed unsecured claim objects to confirmation, the Court may only approve the plan if:

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1).

*son)*, 95 I.B.C.R. 183, 185 (Bankr.D.Idaho 1995). But, such a provision must be included where the trustee or the holder of an allowed unsecured claim has objected to the plan. *In re Than*, 215 B.R. 430, 432 (9th Cir. BAP 1997) ("Such provision [a disposable income clause] is required following an objection to plan confirmation by § 1325(b)...."); *Jackson*, 95 I.B.C.R. at 185 ("Section 1325(b)(1) makes it clear that such a requirement [a disposable income clause] need only be included as a condition of confirmation 'if the trustee or the holder of an allowed unsecured claim objects to confirmation....' "). The purpose of including a disposable income clause is to allow unsecured creditors to share in the debtor's post-confirmation improvement in circumstances. *Id.* Here Storey, the holder of an unsecured claim, has objected to the plan as not paying all disposable income into the plan. To comply with Section 1325(b)(2)(B) all of Debtor's projected disposable income must be paid into the plan. Debtor's plan does not specifically provide for payment of all projected disposable income into the plan. Due to the absence of a clause in Debtor's plan providing that all his disposable income will be paid into the plan the Court will deny confirmation for this reason as well.

## 2. Debtor's Projected Income.

 The Ninth Circuit has adopted the Fifth Circuit's two part process for determining projected disposable income described in *Matter of Killough*, 900 F.2d 61 (5th Cir.1990). *Anderson*, 21 F.3d at 357. First the bankruptcy court must multiply the debtor's monthly income by 36, and then assess the amount of income that is disposable. *Killough*, 900 F.2d at 64, citing COLLIER ON BANKRUPTCY ¶ 1325.08[4][a] (15th ed.1985). COLLIER instructs "[a]s a practical matter, unless there are changes which can be clearly foreseen, the court must simply multiply the debtor's current monthly income by 36." 8 KING ET. AL., COLLIER ON BANKRUPTCY ¶ 1325.08[4][a] (15th ed. rev.2000). The process used in this District is consistent with this approach. *See generally, In re Morrill*, 96.4 I.B.C.R. 145 (Bankr.D.Idaho 1996) ("The combined incomes offset by the combined living expenses result in the Debtor's projected disposable income."); *In re Cavanaugh*, 94 I.B.C.R. 219, 220–22 (Bankr.D.Idaho 1994) (discussing a number of expenses not necessary for the reasonable and necessary support of the debtor).

The key dispute between Debtor and Storey is in the projection of Debtor's income.[18] Storey projects Debtor's income based on his billing rate and a projected number of billable hours. Debtor looks to his past income.

Debtor bills the law firm's clients at a rate of $170 per hour. By Storey's calculations, if Debtor bills an average of 30 hours per week over a 48 week period, Debtor should gross $244,800 per year. By contrast, Schedule I, Debtor's statement of monthly income, shows that Debtor draws only $4,500 per month from the law firm. Of this sum, $550 per month is withheld for payroll deductions, so Debtor "takes home" $3,950 per month.[19] Pre-

---

18. No objection has been made as to Debtor's expenses. Because the parties have confined their arguments to the projection of Debtor's income so will the Court.

19. Young's Exhibit E shows that Debtor's average draw is $5,007 per month. Apparently this distribution is made to Debtor's professional corporation (P.C.). Debtor's P.C. then takes certain withholdings and distributes the remainder ($4,500 per month) to Debtor personally. Debtor then makes withholdings totaling $550, making Debtor's "take home" pay $3,950. Neither the amount of these withholdings nor the reason both Debtor and

suming Debtor were to bill 30 hours per week, in a four week month at Debtor's hourly rate, he should generate $20,400 for the firm each month. That being so, the Court concludes Debtor should fairly expect to receive significantly more from the firm than the $3,950 per month he projects.

Young's Exhibit E, an analysis of Debtor's past income at the firm, would show Debtor has generated far less than $20,400 per month. The 1998 Profit & Loss Statements from Mauk & Burgoyne shows Debtor's billings were $133,328.29,[20] an average of $11,110.69 per month, while Debtor's personal draws totaled $53,999.88, or an average of $4,499.99 per month. For 1999, the Profit & Loss Statement shows Debtor billed $173,550.28, an average of $14,462.52 per month. Debtor's personal draws totaled $70,557.54, or $5,879.79 per month. Through October 31, 2000 Debtor had billed $122,796.27, an average of $12,279.63 per month, and his draws totaled $49,652.53, an average of $4,965.25 per month. It is based on this information that Debtor projects his future income.

In response Storey argues that Debtor is being undercompensated or is deliberately underearning. Dividing Debtor's gross billings by his current hourly rate of $170 per hour yields 772.33, the approximate the number of hours Debtor has worked during the ten month period ending October 31, 2000.[21] Dividing 772.33 by ten months, Debtor averaged 77.23 billable hours per month. This rather low number of billable hours can possibly be attributed, at least in part, to Debtor's involvement in the Virginia litigation.

However, under *Anderson,* the standard the Court must apply in projecting Debtor's income is to multiply Debtor's current monthly income by 36. Under *Heath,* Storey bears the burden of producing satisfactory evidence showing Debtor's is not applying all his disposable income to the plan. No evidence has been put forth showing the number of billable hours Debtor could expect to bill if he were rid of the Virginia litigation. As Debtor points out, the 30 hours per week Storey projects appears to be hypothetical. And in any event, the Court cannot clearly foresee when or in what amounts Debtor's income and billable hours would increase if his plan were confirmed.

■ There is a way to address what the Court concludes is the likelihood that Debtor's income will increase in the future. Debtor could choose to file a plan proposing graduated payments, increasing over the term of the plan to reflect Debtor's hopefully improved circumstances. In the event Debtor's plan payments prove too high, he would of course have the right to modify the plan under Section 1329. Also, as Debtor has proposed for his current plan, he could be expected to provide monthly statements of his P.C. and the Mauk & Burgoyne law firm to Trustee. In the opinion of the Court, this reporting should satisfy Trustee's concerns about future monitoring of Debtor's income, and

his P.C. make withholdings was adequately explained to the Court.

**20.** These annual billing figures include Debtor's personal billings, revenue generated by paralegals and reimbursed costs.

**21.** The Court realizes that Debtor's current billing rate may not have been effective for the entirety of the year 2000, and that Debtor does take some cases on a contingency basis. But, through October 31, 2000, Debtor had personally billed $96,182.17, if divided by $170 then Debtor would have worked only 565.77 for those ten months. The purpose of this analysis is to give an approximation of Debtor's billable hours to consider whether Debtor is undercompensated or underearning.

provide a ready source of information to the creditors.

## IV. Conclusion.

Debtor has shown a lack of candor with the Court and his creditors. He proposes preferential treatment of his friend, brother and accountant over other creditors, and he has not provided reliable information concerning his income and expenses. Debtor engaged in sanctionable conduct in the Virginia courts, and facing further penalties, attempted to use this bankruptcy case as a tactic to gain an advantage in the litigation. His choice to avoid and discharge his indemnity obligation to Storey exposes her to financial ruin. On balance, the Court concludes Debtor has not shown is plan has been proposed in good faith.

Additionally, Storey has objected to Debtor's plan as not applying all Debtor's disposable income to the plan and Debtor's plan does not specifically include a disposable income clause. Given her objection, a disposable income clause is required in the plan.

■■■ For these reasons, confirmation of Debtor's amended Chapter 13 plan must be denied. Moreover, ample grounds exist to dismiss this case, and perhaps the Court should do so. *See* 11 U.S.C. § 1307(c). However, and in spite of Debtor's less than adequate proposals made thus far, the Court can not conclude Debtor could not propose a confirmable plan, if he chose to do so.

To address the problems noted above, such a plan would likely provide for payments to creditors for the maximum term allowed by the Code in amounts that are truly consistent with what Debtor can expect to produce through his practice when coupled with a frugal budget. Under a confirmable plan, Creditors must be treated fairly and equitably, not singled out for preferential or discriminatory treatment where no basis for such appears. Debtor's plan would be accompanied by a meticulously accurate and complete accounting for all of Debtor's past, present and future assets, debts, income and expenses.

In the final analysis, perhaps the best indicator of Debtor's good faith is whether Debtor is willing to propose such a plan. Trustee reports Debtor is current in his plan payments, and so the Court presumes Debtor is genuinely interested in dealing, lawfully, with his financial woes. On the other hand, the Court is cognizant that Chapter 13 plans are voluntary, and Debtor, not the Court, must take the initiative to reorganize Debtor's financial affairs.

Confirmation of Debtor's amended plan will be denied. However, Debtor will be allowed one further opportunity to propose a confirmable plan. Assuming Debtor is willing to muster the good faith, meet the objections posed by his creditors, and address the concerns of the Court discussed above, Debtor should file a second amended plan within fourteen (14) days. If he does, the Court will review it, and if warranted, schedule it for further confirmation hearing. If Debtor fails to file such a confirmable plan, the case will be dismissed without further notice or hearing.

A separate form of order will be entered.