**In re Clayton J. JOHNSON and Elisabeth C. Johnson, Debtors.**

No. 00–41673.

United States Bankruptcy Court, D. Idaho.

June 5, 2001.

William H. Mulberry, Ririe, Idaho, for Debtors.

Charles Johnson, Pocatello, Idaho, for Creditors WardCon, Inc., and Wesley and Jodi Smith.

L.D. Fitzgerald, Pocatello, Idaho, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background

This case comes before the Court to address the objection to confirmation of Debtors' proposed Chapter 13 plan raised by creditors Wardcon, Inc., and Wesley and Jody Smith (collectively "Creditors") (Docket Nos. 19 and 30).[1] Other pending motions must be resolved as well. Several days of testimony and evidence were adduced at a consolidated hearing, concluding on April 12, 2001. The objections to confirmation and all other motions were taken under advisement at that time. This Memorandum constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

### II. Facts

In 1996, Debtors Clayton J. and Elizabeth C. Johnson ("Debtors") owned and operated a sign-making business in Post Falls, Idaho. Mr. Johnson was approached by Mike Wardell of Wardcon,

---

1. Lemhi County also filed an objection to confirmation (Docket No. 16), since Debtors' plan provided for payments on accrued property taxes of $385.08, whereas the tax lien on Debtors' real property amounts to $1,245.62. However, this objection was resolved when at the hearing Debtors agreed to modify their plan to pay the tax lien in full after reducing some of Mr. Johnson's business expenses. This modification will be discussed further below.

Inc., who was interested in purchasing a small business for his daughter and son-in law, Wesley and Jodi Smith. When Mr. Wardell asked Mr. Johnson to review his financial records for the business, Mr. Johnson indicated he did not maintain very good records for the business, and instead gave him his bank statements and tax returns as a reflection of the financial status of the business. After analyzing this somewhat sketchy information, Mr. Wardell agreed, via Wardcon, Inc., to purchase the business. In addition, Mr. and Mrs. Smith purchased Debtors' house and attached shop. After paying off the lien on the house, Debtors received $70,000 in cash plus 100 gold Krugerands, worth approximately $40,000 at the time, from the sale proceeds.

Debtors then moved to Noxon, Montana, where they began construction of a new house. Debtors assert that all of the money received from sale of the business and home was invested in building this home, for living expenses, and in purchasing new sign-making equipment. While he did not have written records to document all the transactions, Mr. Johnson testified that all of the gold Krugerands were sold for these purposes, the last 16 of which were sold in Seattle in December 1996 in order to purchase equipment.

Approximately fourteen months after moving to Noxon, Debtors had a run-in with what they described as a local white supremacist faction. This encounter apparently culminated in shots being fired at Debtors' home allegedly by the white supremacists. As a result, Debtors sold their new home as quickly as possible and left Noxon. The house sales price was approximately $78,000, with Debtors receiving approximately $50,000 from the sale. Debtors then traveled to Florida and the east coast, deciding an extended vacation and cruise was in order after their ordeal.

Eventually, in 1998, Debtors moved to Salmon, Idaho. Of the $50,000 they had received from the Noxon home sale, Debtors had approximately $16,000 remaining. In June 1999, Debtors purchased a home for $60,000, utilizing a gift of $15,000 from Dr. David and Katherine Earl for the down payment, and borrowing $45,000 from Leslie and Eleanor Mund, who then took a deed of trust on the home. Two additional loans of $10,000 were extended by the Munds to Debtors to allow them to make improvements to the residence. Debtors owe Munds approximately $64,000 on the various house loans.

Meanwhile, Creditors had sued Debtors in state court in North Idaho, alleging Debtors made numerous misrepresentations to them in connection with their purchase of the sign business. When Debtors did not answer the complaint, a default judgment was entered in Creditors' favor on June 19, 1998, for $50,000, attorney's fees and costs of $468.52, together with postjudgment interest. Debtors insist they were never aware of the filing or pendency of the lawsuit, or of the entry of the judgment, until the Lemhi County Sheriff came to levy on virtually all their property in Salmon, Idaho, on September 18, 2000.

Largely in response to this levy, Debtors filed for relief under Chapter 13 of the Bankruptcy Code on October 3, 2000. However, despite Debtors' requests that the sheriff return their property after advising him of the bankruptcy, the property was not returned, and on October 12, 2000, Debtors filed a Motion for Turnover of Property (Docket No. 8) directed to Creditors and the sheriff. After hearing and entry of an order by this Court, the property was finally returned, but not until October 31.

Mr. Johnson resumed his sign-making business in Salmon. However, his health is, in a word, bad. The Social Security Administration has determined he is totally disabled. Mr. Johnson is able to work at making signs just a few hours per week, and generates about $408 per month, less business expenses of $272. He receives $754 per month in disability benefits, and Mrs. Johnson and their son receive $183 and $188 per month respectively in benefits as well. Mrs. Johnson also operates a private school in Debtors' home, which produces $1,333 per month, less expenses of $343.[2] In their schedules, Debtors value their home at $89,000.

In their plan, Debtors propose monthly payments to the Chapter 13 trustee of $127 (Docket No. 3), which they represent is their total disposable income under their budget. However, as referenced above, at hearing Debtors orally modified the plan by increasing plan payments $32 per month to pay Lemhi County property taxes. This increase represents the amount by which Mr. Johnson has reduced the advertising expenses for his sign-making company.

Creditors object to confirmation of the plan, asserting that Debtors have not proposed their plan in good faith, that they have undervalued their home, that the plan is not in the best interests of creditors, and that Debtors have not committed all their disposable income to plan payments. Creditors have also filed a Motion to Compel (Docket No. 29), and a Motion to Allow Claim (Docket No. 42). Debtors have filed a Motion for Fees, Costs, and/or Sanctions (Docket No. 17); Motion to Avoid Judicial Lien (Docket No. 38); and Motion to Avoid Preferential Transfer (Docket No. 45).

Chapter 13 Trustee, L.D. Fitzgerald ("Trustee") recommends confirmation of the plan as orally modified to accommodate the higher tax claim of Lemhi County. Trustee also indicated that, according to his analysis, Debtors have committed all of their disposable income to the plan and that confirmation of the plan is in the best interests of creditors. In addition, Trustee does not believe that Creditors' Motion to Allow [Late] Claim should be granted.

Creditors' objections to confirmation of Debtors' plan and all pending motions are addressed below.

## III. Discussion

### A. Objections to Confirmation

#### 1. Good Faith

Creditors object to confirmation of Debtors' plan alleging it was not filed in good faith as required by Section 1325(a)(3). 11 U.S.C. § 1325(a)(3). Debtors dispute this contention.

■■■■ To be confirmed, the Code requires that the debtor show "the plan has been proposed in good faith and not by any means forbidden by law." A Chapter 13 debtor's burden of proving that a plan is proposed in good faith is particularly heavy when the debtor seeks to invoke the so-called "superdischarge," that is, to discharge debts otherwise excepted from discharge under Chapter 7. *In re Padilla*, 213 B.R. 349, 352 (9th Cir. BAP 1997); *Fidelity & Casualty Co. of New York v. Warren (In re Warren)*, 89 B.R. 87, 93 (9th Cir. BAP 1988). The term "good faith" is not defined in the Code nor explained in the statute's legislative history, and thus must be determined on a case-by-case basis. *Goeb v. Heid (In re Goeb)*, 675

---

**2.** The monthly income and expenses for the school actually accrue during the nine-month school year. The totals have been prorated over 12 months here and in Debtors' schedules.

F.2d 1386, 1389–90 (9th Cir.1982). Therefore, in determining whether a plan has been proposed in good faith, the bankruptcy court must consider the totality of the circumstances, including the debtor's prepetition conduct. *550 W. Ina Road Trust v. Tucker (In re Tucker),* 989 F.2d 328, 330 (9th Cir.1993).

■ In conducting its analysis, *Goeb* instructs the bankruptcy court to "inquire whether the debtor misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code or otherwise proposed his Chapter 13 plan in an inequitable manner," but does not attempt to specify a comprehensive list of relevant factors to consider in making its decision. *Id.* Over the years, the bankruptcy courts have utilized a number of other non-exhaustive factors in determining whether the debtor has proposed a plan in good faith, including:

1) The amount of the proposed payments and the amounts of the debtor's surplus;

2) The debtor's employment history, ability to earn, and likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8) The existence of special circumstances such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11) The burden which the plan's administration would place upon the trustee.

*Warren,* 89 B.R. at 93; *In re James,* 260 B.R. 498, 01.1 I.B.C.R. 30, 32 (Bankr.D.Idaho 2001); *In re Lindsey,* 95 I.B.C.R. 142, 146 (Bankr.D.Idaho 1995). Those factors are discussed below.

**a. Special Circumstances/Debtors' Employment History, Ability to Earn, and Likelihood of Future Increases in Income**

■ Creditors assert that the level of income reflected on Debtors' schedules is lower than that which they could be earning, especially given Mr. Johnson's employment and earning history. While the existence of special circumstances is not typically the first factor considered by courts in conducting the good faith analysis, it must be discussed first here, as it impacts the other good faith factors.

Based upon the evidence presented at the hearing, it appears Mr. Johnson suffers from a variety of very serious medical problems, including rheumatoid arthritis, crushed discs in his back and damaged discs in his neck, high blood pressure, and obesity. He also experiences "migraine syndrome," which causes the patient to see flashing lights, have tunnel vision, and with particularly extreme episodes, can cause unconsciousness and disorientation. Mr. Johnson was deemed totally disabled by the Social Security Administration on January 11, 1999, based upon the medical reports of Dr. Earl and other doctors. Debtors' Exhibit 40. Dr. Earl testified that in order to be entitled to receive these government disability benefits, a person

must be unable to engage in any gainful employment activities.

According to Dr. Earl's testimony and his report of December 16, 1998, Mr. Johnson can be expected to work a total of two to three hours per day. Debtors' Exhibit 41, p. 3. However, he can only work a few minutes at each task before feeling pain, needs to change his position constantly, and requires rest after about an hour of working. *Id.* Additionally, Dr. Earl indicates Mr. Johnson has only about 25% of the ability he had in the previous two to three years to work. *Id.* Creditors did not produce any substantial evidence or testimony which would contradict this assessment of Mr. Johnson's health.

Because of this disability, then, Mr. Johnson's employment history is not an accurate forecast of his current or future ability to work. Given the decline in his health over the last few years, it seems clear Mr. Johnson's future income is more likely to decline than increase.

Mrs. Johnson's future income does not appear likely to increase either. Mrs. Johnson is a teacher, providing private instruction to a small group of children in her home in a tiny, rural community. Debtors' home is modest in size (one bedroom and approximately 1462 square feet; Debtors' Exhibit 38). It does not appear to the Court that Mrs. Johnson could expand her home schooling business to accommodate more than the current eight children, and her income will likely remain stable.

Given these facts, and that Debtors' total income is likely to remain stable or possibly even decrease, rather than increase, in the future, the Court concludes neither Debtor is "underemployed," and in this respect, there is no evidence of bad faith.

### b. Amount of Proposed Payments and Amount of Debtors' Surplus

■ Along the same lines as Debtors' earning potential, Creditors also take issue with the small amount Debtors propose to pay into the plan. However, scrutinizing Debtors' budget, the Court finds nothing remarkable. The original proposed payment amount was $127 per month. Debtors agreed to increase this payment by $32 per month to account for the higher tax claim of Lemhi County. This increase in payment was effectuated by a corresponding reduction in Mr. Johnson's advertising expenses. While a payment of $159 per month is relatively small in the general context of Chapter 13 plans, such a payment does represent the total surplus reflected in Debtors' budget. As with Debtors' earning potential discussed above, the modest amount of their proposed monthly payment does not, under these facts, evidence bad faith.

### c. Duration of the Plan

■ Debtors have proposed a standard 36–month plan as allowed under Section 1322(d). 11 U.S.C. § 1322(d). Creditors argue that by proposing a plan running only the minimum length of time prescribed by the Code itself represents bad faith. They point out that extending the plan to the statutory maximum of 60 months would provide a much larger distribution to unsecured creditors. This last point is obviously true, and would be so in virtually every Chapter 13 case. However, Congress has determined that 36 months is an allowed term for a plan, and requiring the plan to be extended beyond the minimum in this case appears to the Court an unfairly harsh requirement, given the deterioration of Mr. Johnson's physical condition over the past several years. While functionally and medically "disabled", Mr. Johnson has, in order to suc-

cessfully propose and complete a Chapter 13 plan, expressed a willingness to work limited hours each week. Proposing a plan for the minimum time allowed under the Code does not evidence bad faith under the facts of this situation.

### d. Type of Debt to be Discharged

With the exception of Creditors' claim, the other claims which Debtors seek to discharge after successful completion of their Chapter 13 plan appear to be an unremarkable collection of common consumer debts which would likely be dischargeable in a Chapter 7 liquidation. By contrast, Creditors' claim might be nondischargeable in a Chapter 7. Creditors filed a lawsuit in state court alleging breach of contract, misrepresentation, and intentional interference with business relations. Debtors did not respond and instead, Creditors were awarded default judgment.[3]

Under Section 523(a)(2)(A), a debt will be excepted from discharge in Chapter 7 if incurred by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In that setting, the creditor must prove that: "(1) the [debtor] made a representation; (2) which at the time the [debtor] knew was false; (3) the representation was made with the intent to deceive; (4) the [creditor] relied on the representation, and (5) the [creditor] sustained the alleged loss as the proximate result of the representation." *Wussler v. Silva (In re Silva)*, 00.2 I.B.C.R. 66, 68 (Bankr.D.Idaho 2000), *citing American Express v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996). To show reliance, Creditors must

prove they were justified in accepting and acting on Debtors' misrepresentations. *Farmers and Merchants State Bank v. Cracchiolo (In re Cracchiolo)*, 00.2 I.B.C.R. 84, 86 (Bankr.D.Idaho 2000), *citing Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

Creditors' state court complaint includes the following allegations:

> 3.8 Clayton Johnson intentionally and/or knowingly misrepresented the age and service history of Johnson Signs' equipment, including but not limited to the computer system and telephone answering machine.
>
> 3.9 Clayton Johnson knowingly and or intentionally misrepresented gross sales, cost of sales and other information relating to the business in the process of the purchase and sale agreement.
>
> \* \* \* \* \* \*
>
> 6.2 Defendant knowingly, recklessly and/or intentionally made material misrepresentations in order to elicit the purchase agreement, covenant not to compete and consultant agreement.

Complaint for Damages (Creditors' Exhibit D). These allegations, if accepted as true, would go a long way toward establishing the elements of a nondischargeable debt under Section 523(a)(2).

Although the Court is not convinced that Creditors could have proven their claims on the merits, and particularly the justifiable reliance element, the Court need not conduct a full dischargeability analysis in the context of this Chapter 13 case. However, if the above allegations are taken as true and given collateral effect here, as Debtors concede they likely should be [4], it

---

3. Debtors assert they were never properly served with process in the state court action. They have taken no action in state court to have the default judgment set aside, though.

4. *See Olson v. Kirkham*, 111 Idaho 34, 720

appears that the default judgment may be nondischargeable in a Chapter 7 case under Section 523(a)(2)(A). This is one factor which weighs against Debtors in the Court's good faith analysis.

### e. Motivation and Sincerity of Debtors

 As noted, Creditors are very concerned that several years ago, Mr. Johnson's income from sign-making was significantly higher than now. However, as indicated above, Mr. Johnson's physical condition has significantly deteriorated over the past several years and he is now disabled. Any questions concerning his motivation appear to be overridden by his physical limitations.

Additionally, Creditors complain that Debtors have spent considerable time and money making improvements to their home before bankruptcy, thereby increasing the value of an exempt asset to the detriment of creditors. The total amount spent on this home is not completely clear from the record, however, at least $20,000 has been advanced by the lenders for this purpose. While this factor certainly bears mention, it appears that when Debtors bought the home, it was a "fixer-upper," in need of quite a bit of work. Because Mrs. Johnson teaches school in the home, it seems to the Court the improvements were likely justified to provide a safe and comfortable environment for the children.

Given Mr. Johnson's disability, it does not appear that the Debtors lack motivation or sincerity in either their earning projections or in paying $159 per month in their Chapter 13 plan. Neither does it appear that spending $20,000 to fix up the home in which they live and Mrs. Johnson operates a private school was inappropriate.

### f. Debtors' Candor with the Court/Accuracy of Schedules

 One of Creditors' main assertions is that Debtors have hidden assets, or at least failed to adequately explain the disposition of those assets, including gold Krugerands and cash, in an effort to deceive this Court and thwart their creditors. The evidence and testimony presented by Debtors did not precisely account for the sale of all the various gold Krugerands they acquired, or all the money received from the sale of the business. However, as opposed to fraud, the Court concludes the more probable explanation for this lack of proof is Debtors' haphazard bookkeeping habits. On the other hand, Creditors were unable to offer any definitive proof that Debtors had assets other than those listed on their schedules. While the Court finds it curious, even a little disturbing, that Debtors would embark upon a lengthy vacation, consuming nearly all of the money received from the sale of their home in Noxon, these actions do not evidence an evil motive nor do they demonstrate Debtors engaged in the hiding of assets.

### g. Weighing the Factors

 On balance, while the fact that Creditors' debt might be nondischargeable in a Chapter 7 case weighs against Debtors in the good faith analysis, by itself, a debtor's desire to take advantage of the broader discharge provided in Chapter 13 does not necessarily rise to the level of bad faith. *See e.g., Lawrence Tractor Co. v. Gregory (In re Gregory),* 705 F.2d 1118, 1121 n. 4 (9th Cir.1983); *Warren,* 89 B.R. at 93–94; *In re James,* 260 B.R. 498, 01.1

P.2d 217, 220 (1986) ("[U]pon default, the allegations of the complaint are taken as true.").

I.B.C.R. 30, 35 (Bankr.D.Idaho 2001). Consideration of the other factors discussed above persuade the Court to conclude that Debtors' Chapter 13 plan was proposed in good faith. Therefore, Creditors' Objection to Confirmation (Dockets No. 19 and 30) on this basis must be overruled.[5]

### 2. Best Interests of Creditors

■ Creditors also contend Debtors' proposed plan does not meet the so-called "best interests of creditors" test, as required by Section 1325(a)(4). 11 U.S.C. § 1325(a)(4). Creditors are of the opinion that if Debtors' assets were liquidated in a Chapter 7 case, creditors would receive more than they will receive under Debtors' proposed plan. Trustee, however, indicated that when he analyzed Debtors' property, the only non-exempt items capable of liquidation are Mr. Johnson's sign-making equipment. Trustee feels that due to the specialized nature of this equipment, there would be a very limited market for such equipment, resulting in a very limited resale value. Therefore, Trustee concluded that, in his opinion, Debtors' plan does meet the best interests of creditors test as liquidation under Chapter 7 would not provide more return to unsecured creditors than that proposed in Debtors' plan.

Creditors offered no evidence or testimony as to the liquidation value of Debtors' sign-making equipment or other assets which could discredit Trustee's best interest analysis. The opinions of Trustee, who also serves as a Chapter 7 panel trustee in this District, and who has presided over the liquidation of literally thousands of cases, are entitled to considerable weight in the Court's opinion. The Court is satis-

fied that Debtors' plan does meet the requirements of Section 1325(a)(4). Creditors' Objection is overruled on this basis as well.

### B. Debtors' Motion to Avoid Lien (Docket No. 38)

■ Debtors move to avoid Creditor's judgment lien on their homestead real property under Section 522(f)(1)(A) which provides in pertinent part, "the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would otherwise be entitled." 11 U.S.C. 522(f)(1)(A). Section 522(f) requires a four-part analysis, in which Debtors have the burden of proving the following: "(1) an exemption to which they are entitled under § 522(b); (2) that the property is listed on debtor's schedules and claimed as exempt; (3) that the lien impairs the exemption; and (4) that the lien is judicial rather than consensual." *In re Conley*, 99.1 I.B.C.R. 7 (Bankr.D.Idaho 1999) (citing *Morgan v. F.D.I.C. (In re Morgan)*, 149 B.R. 147, 151 (9th Cir. BAP 1993)).

Here, there is no dispute regarding any of the four elements. Creditors' only plausible objection to the motion is their assertion that Debtors have undervalued their home in an attempt to protect nonexempt equity. In Debtors' schedules, the home is valued at $89,000. It is subject to the County's tax lien of $1,245.62, and a deed of trust securing loans totaling $64,000. Debtors' Schedules A, C and D. Debtors introduced an appraisal at trial, in which the home was valued at $74,000. Debtors' Exhibit 38. Creditors were unable to produce any admissible evidence to contradict these values.

---

**5.** To the extent Creditors have raised other issues regarding Debtors' good faith, the Court has considered those arguments and does not believe they warrant separate discus-

sion here. Suffice it to say that in the analysis, all other factors not specifically discussed herein are either neutral or weigh in favor of finding good faith.

In Idaho, debtors may exempt $50,000 in equity in their homes. Idaho Code § 55–1003. Here Debtor's have at most approximately $24,000 in equity in the home after the tax lien and deed of trust are considered. Creditors' judicial lien obviously impairs Debtors' homestead exemption. 11 U.S.C. §§ 522(f)(1)(A); (f)(2)(A); *Bishop v. Conley (In re Conley)*, 00.1 I.B.C.R. 15, 22 (Bankr.D.Idaho 2000). Debtors' motion to avoid Creditors' judicial lien (Docket No. 38) will be granted.

## C. Debtors' Motion to Avoid Preferential Transfer (Docket No. 45)

Debtors also seek to avoid the perfection of Creditors' judgment lien as a preferential transfer. However, Section 547 generally authorizes only the trustee to avoid a transfer of an interest in property as a preference[6]. In addition, an action to avoid a lien as a preference requires the procedural formalities of an adversary proceeding, and cannot be undertaken via motion. Fed. R. Bankr.P. 7001(2) However, because Creditors' judgment lien is avoidable under Section 522(f) as discussed above, the Court need not consider this motion. Therefore, Debtors' Motion to Avoid Preferential Transfer (Docket No. 45) is deemed moot.

## D. Creditor's Motion to Allow Claim (Docket No. 42)

Section 502(b)(9) instructs the Court to allow a claim unless a party in interest objects and "proof of such claim is not timely filed," subject to certain exceptions not applicable here. 11 U.S.C. § 502(b)(9). Rule 3002(a) provides: "An unsecured creditor or an equity security holder *must* file a proof of claim or interest for the claim or interest to be allowed,"

(inapplicable exceptions omitted) (emphasis added). Fed. R. Bankr.P. 3002(a). Rule 3002(c) further provides that a proof of claim is timely if filed within 90 days of the first date set for the Section 341 meeting of creditors, except in five particular instances. Fed. R. Bankr.P. 3002(c). Again, none of these exceptions to the general rule are implicated here.

In this case, Debtors' Section 341(a) meeting of creditors was conducted on November 8, 2000. The bar date for filing timely claims was therefore February 6, 2001. Creditors did not file their proof of claim until March 6, 2001. Debtors object to the allowance of this claim (Docket No. 40).

By their motion, Creditors ask this Court to allow their tardily filed claim based upon excusable neglect. Alternatively, Creditors urge the Court to conclude that their formal but tardy proof of claim was merely an amendment of an informal timely-filed proof of claim.

### 1. Excusable Neglect

Prior to retaining their present attorney, Creditors consulted and were represented by three other attorneys. Apparently the third of those lawyers prepared a formal proof of claim, but did not file it. When Creditors' present counsel assumed responsibility for the case and obtained his clients' file, he erroneously assumed a proof of claim had been filed. Counsel candidly asserts to the Court that any failure to file the proof of claim within the time period set by the Court was "all my fault." Therefore, Creditors request this Court to exercise its equitable powers to allow the late filing due to mistake or excusable neglect.

---

**6.** There is an exception to this general rule found in 11 U.S.C. § 522(h) which may apply here, since Debtors' home equity is exempt.

However, there is no need for the Court to decide if this statute applies in this case.

■ Regrettably, even if the Court were persuaded it should entertain the late claim, it has no authority to do so. While the Court is generally granted authority under Rule 9006(b)(2) to enlarge the time for taking certain acts, subsection (b)(3) of the Rule specifically limits this ability with regard to the time limits established by Rule 3002 to the extent and under the conditions stated in those rules. Fed. R. Bankr.P. 9006(b)(3). Given the unambiguous language of Rule 9006(b)(3) and controlling case law, this Court concludes it is simply not permitted to equitably enlarge the time period for filing proofs of claim absent facts which place Creditors within one of the express exceptions of Rule 3002. *Gardenhire v. I.R.S. (In re Gardenhire)*, 209 F.3d 1145, 1148 (9th Cir.2000); *In re Downey*, 00.1 I.B.C.R. 34, 35 (Bankr.D.Idaho 2000); *In re Ware*, 98.4 I.B.C.R. 130, 131 (Bankr.D.Idaho 1998).

## 2. Informal Proof of Claim

■ In order to establish they have timely submitted an "informal" proof of claim, Creditors must demonstrate the existence of some writing which contains "an explicit demand showing the nature and amount of the claim against the estate, and evidenc[ing] an intent to hold the debtor liable." *Sambo's Restaurants, Inc. v. Wheeler (In re Sambo's Restaurants, Inc.)*, 754 F.2d 811, 815 (9th Cir.1985); *Dicker v. Dye (In re Edelman)*, 237 B.R. 146, 155 (9th Cir. BAP 1999); *In re Downey*, 00.1 I.B.C.R. 34, 35 (Bankr.D.Idaho 2000).

■ In this case, Creditors' Objection to [Debtors'] Motion for Turnover of Property (Docket No. 10) is the only document filed by Creditors which could even arguably meet the elements of a timely informal proof of claim[7]. The objection was filed on October 20, 2000, well in advance of the February 6, 2001 deadline for filing proofs of claim. In this objection, Creditors recite:

> Wardcon, Inc., possesses a judgment lien against the debtors. The property is retained pursuant to a valid levy of a writ of execution pursuant to that lien. The judgment lien was perfected prepetition, on September 5, 2000; Wardcon obtained the judgment on September 19, 1998.

Objection to Motion for Turnover (Docket No. 10), ¶ 1. Debtors and Trustee both argue this document does not meet the requirements to establish an informal proof of claim. However, the Court finds it is adequate.

Technically, Creditors' objection does not include an explicit demand referencing the amount of their claim, and the only reference to the nature of the claim is that it consists of "a judgment lien." However, the Ninth Circuit has held that a document merely indicating the claim was based upon a state court judgment is sufficient to state the nature of the claim. *Wright v. Holm (In re Holm)*, 931 F.2d 620, 622 (9th Cir.1991). Creditors' objection must also be viewed in connection with Debtors' Motion for Turnover of Property (Docket No. 8) to which the objection serves as a response. That motion has a copy of the Writ of Execution issued on Creditors' judgment attached as an exhibit. The Writ of Execution recites the amount of the underlying judgment to be $50,468.52. The objection to turnover also indicates Creditors are resisting Debtors' efforts to obtain the seized property:

---

7. Creditors' Objection to Confirmation of Plan (Docket No. 19) was also filed before the claims bar date, however, it does not reference Creditors' claim at all and therefore will not be considered here.

If this Court permits a turnover through this motion, Wardcon will have no protection under Debtors' Chapter 13 Plan. Currently, the plan suggests that the Debtors will attempt to avoid the Wardcon judgment and the perfected judgment lien. If the judgment lien is avoided, Wardcon's protection under the plan is less adequate than it would receive under Chapter 7. Wardcon will object to the Debtors' plan as it now stands.

Objection to Motion for Turnover (Docket No. 10), ¶ 6. This language is sufficient to put the Trustee and Debtors on notice that Creditors intend to hold the estate liable for the prepetition judgment indebtedness.

In the absence of prejudice to an opposing party, this Court should follow the policy long established in Ninth Circuit case law liberally allowing amendment to a creditor's proof of claim. *Anderson–Walker Industr. v. Lafayette Metals (In re Anderson–Walker Industr.)*, 798 F.2d 1285, 1287 (9th Cir.1986) *citing In re Franciscan Vineyards*, 597 F.2d 181, 182 (9th Cir.1979). Debtors have not shown any prejudice which would result to them if Creditors' informal proof of claim is allowed, since their obligation for payments under the plan will be unaffected by whether Creditors share in the meager return to unsecured creditors. Under these facts, the Court concludes Creditors' Objection to Motion for Turnover qualifies as an informal proof of claim which was timely filed. The formal proof of claim filed on March 6, 2001 serves to amend the proof of claim. Creditors' Motion to Allow Claim (Docket No. 42) will be granted.

## E. Creditors' Motion to Compel (Docket No. 29)

This motion relates to certain discovery propounded by Creditors to Debtors. However, it appears from the record that Debtors ultimately complied with the Creditors' requests for production of documents, and any incomplete responses merely relate to a lack of memory or the length of time which had elapsed between the requested documents and the present case. Creditors have not shown otherwise. Therefore, Creditors' Motion to Compel (Docket No. 29) will be denied.

## F. Debtors' Motion for Fees, Costs, and Sanctions (Docket No. 17)

■ Debtors assert that Creditors' actions in not taking steps to cause the return of their property seized by the Lemhi County Sheriff immediately upon receiving notice of the bankruptcy filing amounted to a willful violation of the automatic stay provided in Section 362(a)(3) which prohibits any attempts to "exercise control over property of the bankruptcy estate." 11 U.S.C. § 362(a)(3). "The stay is self-executing, effective upon the filing of the bankruptcy petition." *McCarthy v. Pettit (In re Pettit)*, 217 F.3d 1072, 1076 (9th Cir.2000). Creditors respond by arguing that the property was in possession of the Sheriff, over whom they had no control, and thus, they have no responsibility for the lengthy delay in return of the property.

The Code provides that "[a]n individual injured by any willful violation of a stay provided by this section *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 363(h) (emphasis added). Debtors' property was taken from them on September 18, 2000, pursuant to a writ of execution issued at Creditors' request in state court on September 15. Debtors filed for bankruptcy on October 3. The same day, Debtors' attorneys faxed a letter to Creditors' then-attorney Lisa Rasmussen and to the Lemhi County Sheriff advising of them of the filing. *See* Attachment to Debtors Motion for Turnover of Property (Docket No. 8). Creditors do not

dispute receipt of this immediate notice. Despite notice of the bankruptcy and receipt of Debtors' demand for return of the property, the execution was not released, and Debtors' property was not returned. Instead, Debtors were forced to file their Motion for Turnover of Property on October 12, in response to which Creditors filed their objection on October 20 (Docket No. 10). A hearing was held in this Court on October 30, at which time the parties stipulated to entry of an order granting the motion (Docket No. 11). However, even after this order was faxed to the Sheriff, the Sheriff refused to return the property, complaining that Trustee's signature did not appear on the conformed copy of the order which had been provided to the Sheriff. It was yet another day until the property was finally returned to the Debtors on October 31.

▬▬ Creditors' levy upon Debtors' property occurred prepetition and was therefore not in violation of the automatic stay. However,

> 11 U.S.C. § 542(a) provides that an entity in possession of estate property 'shall' deliver such property to the trustee. This is a mandatory duty arising upon the filing of the bankruptcy petition. Thus, without doubt, a creditor's knowing retention of property of the estate constitutes a violation of § 362(a)(3).

*State of Calif. Employment Dev. Dept v. Taxel (In re Del Mission)*, 98 F.3d 1147, 1151 (9th Cir.1996) (internal quotations and citations omitted). Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," wherever located and by whomever held. 11 U.S.C. § 541(a)(1). This provision has been interpreted by none other than the United States Supreme Court to encompass property seized prior to the filing of a petition for reorganization. *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 209, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Simply put, Creditors caused nearly all Debtors' household and other property to be seized. In doing so, the Sheriff acted on Creditors' instructions as their statutory collection agent. As a result, when they received notice of the bankruptcy filing, Creditors were charged with the affirmative duty to effect a return of the seized property of the estate or risk violation of the automatic stay.

▬▬ The Court concludes a stay violation occurred under these facts. Creditors attempt to shield themselves from liability for the stay violation by asserting that it was the Sheriff who was in actual possession of the property[8]. Creditors insist they had no independent duty to ensure return of the property. This argument is unavailing. "The stay requires the creditor to maintain the status quo ante and to remediate acts taken in ignorance of the stay." *Franchise Tax Board v. Roberts (In re Roberts)*, 175 B.R. 339, 343 (9th Cir. BAP 1994). Other courts agree.

> [C]reditors and their counsel are not allowed to sit by and watch the litigation they have commenced proceed by shifting responsibility to local authorities charged with collecting judgments obtained through their efforts.... 'The provisions of the automatic stay place the responsibility to discontinue any pending collection proceedings squarely on the shoulders of the creditor who initiated the action ....'

*In re Johnson*, 253 B.R. 857, 861 (Bankr. S.D.Ohio 2000) *(quoting Ledford v. Tiedge*

---

**8.** The Court expresses no opinion concerning whether the Sheriff may have violated the automatic stay under these facts.

*(In re Sams),* 106 B.R. 485, 490–91 (Bankr. S.D.Ohio 1989)).

> [C]reditors [must] take the necessary steps to halt or reverse any pending State Court actions or other collection efforts commenced prior to the filing of a bankruptcy petition, including ... foreclosure of a mortgage or a judgment lien and, thereby, maintain, or restore, the status quo as it existed at the time of the filing of the bankruptcy petition.

*In re Banks,* 253 B.R. 25, 30–31 (Bankr. E.D.Mich.2000) *(quoting Sams,* 106 B.R. at 490); *Sucre v. MIC Leasing Corp. (In re Sucre),* 226 B.R. 340, 347 (Bankr.S.D.N.Y. 1998) (holding that upon receipt of notice of the commencement of a bankruptcy case, it is the creditor's responsibility to ensure it has not violated the stay, or to take affirmative steps to reverse any actions taken in violation of the stay).

On this record, the Court concludes Creditors failed to take appropriate affirmative steps to ensure prompt return of Debtors' property by the Sheriff, and therefore violated the automatic stay. Even upon receiving notice of the bankruptcy, they continued to maintain that turnover was not required, forcing Debtors to have to come into this Court for a remedy, then conceding on October 30 that turnover was appropriate. Under these circumstances, Debtors cannot now hide behind the Sheriff when the Sheriff was merely following their directions. Under these circumstances, Creditors are guilty of violating the automatic stay.

There also can be little doubt Creditors' violation of the automatic stay was "willful."

> A violation of the stay is willful if the creditor knew of the automatic stay and intentionally performed the action that violated the stay, and neither a good faith belief that the creditor had a right

to the property nor good faith reliance on the advice of counsel is relevant.

*Barnett v. Edwards (In re Edwards),* 214 B.R. 613, 620 (9th Cir. BAP 1997) (citing *In re Goodman,* 991 F.2d 613, 618 (9th Cir.1993), citing *In re Taylor,* 884 F.2d 478, 482–83 (9th Cir.1989)); *In re Wyatt,* 173 B.R. 698, 703–704, 94 I.B.C.R. 186, 190 (Bankr.D.Idaho 1994).

The Lemhi County Sheriff levied upon Debtors' property under instruction from Creditors. Creditors therefore had the responsibility to ensure the property was promptly returned upon receiving notice of the bankruptcy petition. Creditors did not fulfill their responsibility, despite knowledge of the bankruptcy and requests by Debtors' counsel. Debtors were put to the expense and delay of bringing a motion for turnover in this Court, which Creditors originally opposed, and then conceded should be granted. In the meantime, Debtors were deprived of their property for nearly a month after the filing of the bankruptcy petition. The Court finds the unnecessary delay in the return of the property was a willful violation of the automatic stay, for which Debtors should recover their actual damages, including attorney fees and costs. 11 U.S.C. § 362(h).

As to those fees and costs, Debtors' counsel, Peter Contos has submitted an affidavit detailing his efforts concerning obtaining turnover of Debtors' assets, and itemizing the fees incurred in connection with his services, which total $1,987.50, plus costs in the amount of $8.58 (Docket No. 54). In order to secure return of the property, counsel wrote letters, made several phone calls, prepared and filed the motion for turnover, appeared at a hearing on the motion, and conducted research regarding the legal issues. A total of about 16 hours were expended. In light of the work required to obtain the return of the property for Debtors, the Court concludes

Creditors should pay Debtors, in care of the Chapter 13 Trustee, the amount itemized in counsel's affidavit as damages for their violation of the automatic stay as required by Section 362(h). The Trustee shall use these funds to, in part, pay Debtors' attorneys fees and costs allowed through the plan. No other actual or punitive damages were requested nor proven at the hearing by Debtors, and none will be awarded.

## G. Debtors' Counsel's Request for Attorney's Fees and Costs (Docket No. 53)

 Mr. Mulberry, co-counsel for Debtors, filed an affidavit concerning attorney fees and costs (Docket No. 53), and requesting Court approval for payment to him of $1,500 in fees, from a retainer given him prior to the bankruptcy filing. Pursuant to Section 330, in a chapter 13 case, the court may allow reasonable compensation to the Debtors' attorney after consideration as to whether the services were beneficial and necessary to the Debtors and other factors listed in Section 330. 11 U.S.C. §§ 330(a)(3); 330(a)(4)(B). After review of counsel's affidavit, it certainly appears that counsel's services were necessary and beneficial to the Debtors in this contentious case, and there have been no objections to the amount requested. Therefore, the Court will approve counsel's request for payment of $1,500 in fees.

Counsel's affidavit actually details services and costs totaling $16,800.63. However, no provision is made in the plan for payment of the balance of the fees owed counsel over and above the retainer, although any sums paid to Trustee by Creditors for the stay violation damages, discussed above, may be distributed to counsel. Therefore, the Court expresses no opinion as to the reasonableness of the additional amounts set forth in the affidavit or how any additional fees will be paid, and counsel must seek approval for any further payments at a later date after further motion, notice and hearing.

## IV. Conclusion

For the reasons stated above, the Court concludes as follows:

Debtors' proposed Chapter 13 plan was filed in good faith as required by Section 1325(a)(3) and meets the best interests of creditors test as set forth in Section 1325(a)(4). Therefore, Creditors' Objections to Confirmation (Docket Nos. 19 and 30) will be overruled;

Debtors' Motion to Avoid Judicial Lien (Docket No. 38) will be granted;

Debtors' Motion to Avoid Preferential Transfer (Docket No. 45) is deemed moot;

Creditors' Motion to Allow Claim (Docket No. 42) will be granted;

Creditors' Motion to Compel Responses to Discovery (Docket No. 29) will be denied;

Debtors' Motion for Fees, Costs, and/or Sanctions (Docket No. 17) will be granted and pursuant to Section 362(h), Creditors shall be ordered to pay Debtors, via Trustee, attorney fees and costs of $1,996.08; and

Regarding the Affidavit of Attorney Fees and Costs of William H. Mulberry (Docket No. 53), Counsel may apply the $1,500 retainer received from Debtors pre-bankruptcy. Payment of any further fees and costs will require separate motion, notice and hearing.

Debtors' counsel shall promptly prepare an order confirming Debtors' Chapter 13 plan, as orally modified, consistent with this decision. The form of order should be approved by Trustee.

The Court will enter a separate order disposing of all other motions discussed herein.