In re Lacaya Lynn GALMORE, Debtor.

Lacaya Lynn Galmore, Plaintiff,

v.

Edward Dykstra, Defendant.

Bankruptcy No. 07–22058 JPK.
Adversary No. 07–2114.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

July 25, 2008.

---

David Dabertin, Hammond, IN, for Plaintiff Lacaya Lynn Galmore.

Edward C. Lawhead, Highland, IN, for Defendant Edward Dykstra.

## MEMORANDUM OF OPINION AND ORDER

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

On August 3, 2007, Lacaya Lynn Galmore ("Galmore") filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. The first meeting of creditors was held on September 11, 2007. On November 19, 2007, the court entered an order granting the debtor a discharge under 11 U.S.C. § 727.

Prior to the discharge being entered, on October 18, 2007, Galmore filed an adversary proceeding against Edward Dykstra ("Dykstra") alleging that Dykstra violated the automatic stay when he appeared at the Debtor's § 341 meeting on September 11, 2007 and demanded that Galmore be arrested pursuant to a bench warrant previously issued by the Lake Superior Court under cause number 45D09–0611–SC–3605.[1] The complaint further alleges that as a result of Dykstra's insistence, Galmore was taken into custody by the United States Marshals Service on that date. Galmore requests that as a result of this conduct, she be awarded damages, costs of this action and an order specifically enjoining the Defendant from any further action in violation of 11 U.S.C. § 362.

On November 15, 2007, Dykstra filed an Answer denying the allegation that the stay was violated and denying that he demanded that Galmore be taken into custody pursuant to the bench warrant previously issued by the Lake Superior Court. The answer also states that Dykstra had no authority to insist that Galmore be taken into custody and that the, "United States Marshalls (sic.) Service took it upon themselves to follow through and execute the valid bench warrant for the debtor/plaintiff's arrest, which the defendant had in his possession as he was being cleared for admittance at the security station posted at the main entrance at the Hammond Federal Building/Courthouse, located at 5400 Federal Plaza, Hammond, Indiana 46320." See Defendant's Answer, ¶ 5. As an affirmative defense, Dykstra claims that the complaint fails to state a cause of action upon which relief can be granted due to the fact that Galmore suffered no measurable amount of harm and/or monetary damages due to her detainment at the hands of the Marshals Service.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b) and N.D.Ind.L.R. 200.1(e). This is a core pro-

---

1. According to the record, the bench warrant was issued prepetition on July 12, 2007. (See Defendant's Exhibit 7).

ceeding pursuant to 28 U.S.C. § 157(b)(2)(O) in which the court can enter a final judgement thereon, and venue before this Court is proper pursuant to 28 U.S.C. § 1409(a).

A bench trial was held on March 27, 2008, and the matter is now before the Court for final disposition. The record before the Court is comprised of Galmore's complaint, Dykstra's answer to that complaint, the trial transcript and the following exhibits entered into evidence at trial:

> A recording of the § 341 meeting held on September 11, 2007 (Plaintiff's Exhibit "A");
>
> Final Judgment Order of Possession— marked as Defendant's Exhibit "1";
>
> Order [for Default Judgment]—marked as Defendant's Exhibit "2";
>
> Verified Motion to Enforce Judgment by Proceedings Supplemental to Execution—marked as Defendant's Exhibit "3";
>
> Plaintiff's Verified Motion [as to Garnishee Defendant]—marked as Defendant's Exhibit "4";
>
> Petition for Rule to Show Cause— marked as Defendant's Exhibit "5";
>
> Citation for Civil Contempt—marked as Defendant's Exhibit "6";
>
> Order [Issuing Bench Warrant]— marked as Defendant's Exhibit "7";
>
> Order [Recalling Bench Warrant]— marked as Defendant's Exhibit "8".[2]

### *LEGAL ANALYSIS*

 When a bankruptcy petition is filed, the automatic stay provisions of 11 U.S.C. § 362(a) take effect and pre-petition creditors are prohibited from taking certain actions to collect their debts. *See,* 11 U.S.C. § 362; *In re Vitreous Steel*

*Products Co.,* 911 F.2d 1223, 1231 (7th Cir.1990). The automatic stay is self-executing, effective upon filing of the bankruptcy petition. *In re Gruntz,* 202 F.3d 1074, 1081 (9th Cir.2000). The automatic stay is a powerful tool of the bankruptcy courts that prohibits, among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title" [11 U.S.C. § 362(a)(1) ]; "the enforcement, against the debtor ... of a judgment obtained before the commencement of the case under this title" [11 U.S.C. § 362(a)(2) ]; and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" [11 U.S.C. § 362(a)(6) ]. *See, In re Lyckberg,* 310 B.R. 881, 890 (Bankr. N.D.Ill.2004). The stay is imposed automatically in part to give the bankruptcy court an opportunity to assess the debtor's situation and to embark on an orderly course resolving the estate. *United States v. Michalek,* 54 F.3d 325, 333 (7th Cir. 1995). As stated in, *In the Matter of Holtkamp and Holtkamp Farms, Inc.,* 669 F.2d 505, 508 (7th Cir.1982):

> The purpose [of the automatic stay] is to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* (1978) U.S.Code Cong. & Ad. News 6296–97, thereby preventing a "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *In re*

---

**2.** Defendant's Exhibits 1 through 8 arose out of the state court proceeding—*Dykstra v. Gal-* *more,* Cause No.: 45D09–0611–SC–03605.

*Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y.1981) *citing Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).

Galmore's debt to Dykstra was determined in a default judgment entered by the Lake Superior Court, on February 21, 2007, in the amount of $6,000.[3] After the entry of the judgment Dykstra commenced collection proceedings. On March 6, 2007, Dykstra filed a Verified Motion to Enforce Judgment by Proceedings Supplemental to Execution, requesting that Galmore be ordered to appear in court and answer as to any non-exempt property subject to execution which might be applied to the $6,000 judgment.[4] As a result of this motion, the Lake Superior Court ordered Galmore to appear on June 13, 2007, which she failed to do. On June 15, 2007, the Lake Superior Court entered an order directing the clerk to issue a citation for Galmore to appear before that court to show cause why she should not be held in contempt.[5] However, Galmore failed to appear for this hearing and the Lake Superior Court, on July 12, 2007, issued a bench warrant and set a cash bond in the amount of $6,075.[6]

▮▮▮ Prior to Galmore's filing of her petition for relief, Dykstra was actively attempting to collect a debt: this is perfectly fine, up until the point a bankruptcy petition is filed and the automatic stay goes into effect. The debtor has the burden of providing the creditor with actual notice of the bankruptcy and, upon so providing, the burden shifts to the creditor to prevent violations of the automatic stay.

*Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.1999). If a creditor is uncertain about the applicability of the automatic stay, the creditor may petition the court for clarification; otherwise, the creditor risks exposure under 11 U.S.C. § 362(k)(1) when he undertakes his own determination of the manner in which § 362(a) affects his actions. *Matter of Batla*, 12 B.R. 397, 400 (Bankr.N.D.Ga. 1981); *In re Clark*, 49 B.R. 704, 707 (Bankr.Guam 1985); *In re Kearns*, 161 B.R. 701, 705 (D.Kan.1993), *opinion modified on reconsideration*, 168 B.R. 423; *In re Gray*, 97 B.R. 930, 936 (Bankr.N.D.Ill. 1989). Sanctions should not be imposed where there has been a technical violation of the stay. *In re Welch*, 296 B.R. 170, 172 (Bankr.C.D.Ill.2003); *In re Zunich*, 88 B.R. 721 (Bankr.W.D.Pa.1988). However, 11 U.S.C. § 362(k) provides monetary relief for willful violations of the automatic stay as follows:

> (k) (1) Except as provided in paragraph (2), an individual injured by any *willful* violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.
>
> (2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages. (Emphasis added)

▮▮▮ In this case, for Galmore to successfully recover damages under

---

3. *See,* Defendant's Exhibit 2; This was an eviction action, and prior to February 21, 2007—on January 17, 2007—the Lake Superior Court had entered a Final Judgment Order of Possession. (*See,* Defendant's Exhibit 1.)

4. *See,* Defendant's Exhibit 3.

5. *See,* Defendant's Exhibit 4, Exhibit 5, and Exhibit 6.

6. *See,* Defendant's Exhibit 7.

§ 362(k)(1), she has the burden of establishing the following elements by a preponderance of the evidence: (1) that a bankruptcy petition was filed; (2) that she is an "individual" under the automatic stay provision; (3) that the creditor had notice of the petition; (4) that the creditor's actions were in willful violation of the stay; and, (5) that she is entitled to a form of relief provided by § 362(k); *Radcliffe v. International Painters and Allied Trades Industry Pension Fund,* 372 B.R. 401, 419–20 (Bankr.N.D.Ind.2007); *In re Gossett,* 369 B.R. 361, 375 (Bankr.N.D.Ill.2007); *In re Pincombe,* 256 B.R. 774, 782 (Bankr. N.D.Ill.2000) (analyzing § 362(h), the pre-BAPCPA analog to the current § 362(k)(1)); *see also In re Sumpter,* 171 B.R. 835, 843–45 (Bankr.N.D.Ill.1994). The critical question is whether the violation was ***willful.*** Willfulness under § 362(k) requires knowledge that a bankruptcy petition has been filed, whether through formal notice or otherwise. *In re Lyckberg,* 310 B.R. 881, 891 (Bankr. N.D.Ill.2004); *In re Fridge,* 239 B.R. 182, 190 (Bankr.N.D.Ill.1999). Knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay, and a violation is willful when a creditor acts intentionally with knowledge of the bankruptcy. *In re Welch,* 296 B.R. 170, 172 (Bankr. C.D.Ill.2003). A "willful violation" does *not,* however, require specific intent to violate the automatic stay. *In re Price,* 42 F.3d 1068, 1071 (7th Cir.1994). In the case of *Radcliffe v. International Painters and Allied Trades Industry Pension Fund,* 372 B.R. 401, 419 (Bankr.N.D.Ind. 2007), this court analyzed the meaning of *willful* in the context of § 362(k) as follows:

> The term "willful" is one which surfaces in several places in the Bankruptcy Code, and the Court sees no reason to construe that term differently under 11 U.S.C. § 362(h) [7] than the term has been construed in other sections of the Code. The term "willful" raises its head in 11 U.S.C. § 523(a)(6), which provides that an indebtedness "for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge. This term was the subject of the decision of the United States Supreme Court in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In *Geiger,* the Supreme Court construed the adjective "willful" in conjunction with its modified noun, "injury", and determined that a "willful injury" is one in which injury is intended by an act of the debtor, rather than one in which an intentional act by the debtor causes injury. In *In re Whiters,* 337 B.R. 326 (Bankr.N.D.Ind.2006), this Court construed the evidentiary requirements for establishing a "willful injury" under 11 U.S.C. § 523(a)(6) and determined that the creditor must establish by at least circumstantial evidence that the debtor had a subjective state of mind to commit injury to a property interest of the creditor. As enunciated in *Whiters,* the subjective intent is focused not on creating a financial hardship for the creditor, but rather on whether the debtor intentionally—as contrasted to negligently or perhaps even grossly negligently—deprived the creditor of a property interest. In the context of this case and in the context of 11 U.S.C. § 362(h), a "willful violation" of the automatic stay of 11 U.S.C. § 362(a) is established by evidence that the creditor intentionally—with knowledge of the pendency of

---

7. The applicable provision prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005 was 11 U.S.C. § 362(h); it is now 11 U.S.C. § 362(k). The analysis under § 362(h) and (k) is the same.

the bankruptcy case—deprived the debtor of a property right or interest in property, or undertook an action against the debtor, precluded by 11 U.S.C. § 362(a).

\* \* \*

A good faith belief in a right to the property is not relevant to a determination of whether the violation was willful (citations omitted). A willful violation does not require a specific intent to violate the automatic stay. *The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation.*

As stated in *In re Halas,* 249 B.R. 182, 191 (Bankr.N.D.Ill.2000):

A creditor can be subject to liability under § 362(h) if the creditor engages in conduct which violates the automatic stay, with knowledge that a bankruptcy petition has been filed. *In re Roete,* 936 F.2d 963, 965 (7th Cir.1991). Willfulness can be found even if the creditor believed himself justified in taking the actions found to violate the stay. *In re Sumpter,* 171 B.R. 835, 843 (Bankr. N.D.Ill.1994). Ignorance of bankruptcy law does not excuse anyone involved in a willful violation. (emphasis supplied).

If the actions of the creditor are shown to be willful, then actual damages can be awarded if evidence exists which supports the award of a definite amount, not predicated upon speculation. *In re Lyckberg,* 310 B.R. 881, 891 (Bankr. N.D.Ill.2004). A party must demonstrate the amount of damages it has incurred with reasonable certainty. *Id. (citing, Doe v. United States,* 976 F.2d 1071, 1085 (7th Cir.1992), *cert. denied,* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993)). Under § 362(k), punitive damages are also available. An award of punitive damages is part a deterrent, i.e., to cause a change in the creditor's behavior, and in this context the prospect of such change is relevant to the amount of punitive damages to be awarded. *In re Welch,* 296 B.R. 170, 172–73 (Bankr.C.D.Ill.2003); *In re Riddick,* 231 B.R. 265, 269 (Bankr.N.D.Ohio 1999); *See also, In re Novak,* 223 B.R. 363 (Bankr.M.D.Fla.1997) (bankruptcy court gauges punitive award based on gravity of creditor's offense, and sets award at level sufficient to ensure that it will punish and deter). But punitive damages are also in part meant to punish egregious conduct. Punitive damages should only be awarded with respect to conduct which is tantamount to "thumbing ones's nose at" the law, the debtor, and the Court. *In re Radcliffe,* 372 B.R. 401, 422 (Bankr. N.D.Ind.2007). The factors to be considered in determining whether an award of punitive damages is warranted include the following: the nature of the creditor's conduct, the nature and extent of harm to the debtor, the creditor's ability to pay damages, the level of sophistication of the creditor, the creditor's motives, and any provocation by the debtor. *In re Radcliffe,* 372 B.R. 401, 423 (Bankr.N.D.Ind.2007); *In re Welch,* 296 B.R. 170, 172–73 (Bankr. C.D.Ill.2003); *In re Flack,* 239 B.R. 155, 163 (Bankr.S.D.Ohio 1999); *In re Klein,* 226 B.R. 542, 545 (Bankr.D.N.J.1998); *In re Wills,* 226 B.R. 369, 376 n. 8 (Bankr. E.D.Va.1998).

With the foregoing said, there is no question that Galmore filed a bankruptcy petition and is an individual. Also, at trial, Dykstra admitted that he received notice of the bankruptcy:

Q: Now at some point you received a Notice of Bankruptcy?

A: Yes, I did.

Q: And that was the bankruptcy for this case?

A: Yes.

Q: All Right. And that bankruptcy notice told you that there was a meeting of creditors September 11th, 2007 at 9:30; is that correct?

A: I think so, I can't remember the dates or the time and that but that's—it was right around that period, yes.

Q: Well, I believe the court's record shows that that's—that's the hearing and that's when—you did appear at her Section—

A: Yes, yes, I did. I can't remember what date it was but yes, I did.

Trial Transcript, Direct Examination of Dykstra, p. 13: 9–24

This leaves the question of whether Dykstra's conduct violated the stay and whether such violation was willful. In other words, what actions did Dykstra take (or fail to take) on September 11, 2007—which was the day of the § 341 meeting—and did those actions constitute a willful violation of the stay entitling Galmore to damages?

Galmore contends that Dykstra appeared at the § 341 meeting on September 11, 2007 for the specific purpose of having the outstanding warrant executed and having her put into custody—presumably in hopes that this would somehow compel her to pay the debt. It is Dykstra's position that when he appeared for the § 341 meeting, he brought with him a stack of documents from the state court matter, with the § 341 notice on top. He asked a Court Security Officer ("CSO") for directions and handed the CSO his paperwork. Allegedly, the officer noticed the bench warrant, and it was at that point that the U.S. Marshal's office became involved and acted on the warrant. Further, it is Dykstra's position that *he* is not the one who issued the warrant; rather the Lake Superior Court issued the warrant as noted in this exchange at the § 341 meeting:

Debtor's Counsel: I just, before my client walks out of this court room, uh this hearing room, I want to make it clear I mean you've got the U.S. Marshals waiting for her in the hallway telling me there's an arrest warrant, are you still proceeding on that today?

Dykstra: There is an arrest warrant.

Debtor's Counsel: And you're asking me—

Dykstra: It's not my arrest warrant sir, it's from the county.

Recorded Transcript of § 341 Meeting

 Issues concerning post-petition execution of pre-petition bench warrants have been addressed in other jurisdictions, and courts have variously analyzed a creditor's duty *vis-a-vis* a bench warrant issued by a state court prior to a debtor's filing of bankruptcy. First, other courts have drawn a distinction between a contempt proceeding which is civil in nature, and one which is criminal in nature and, based on the Bankruptcy Code, have treated each differently.

The automatic stay is a creature of statute; as such, its scope is governed wholly by the language of 11 U.S.C. §§ 362(a)-(b). The automatic stay of § 362(a) lies unless one of the specific exceptions of § 362(b) is applicable. *In re Blarney, Inc.,* 53 B.R. 162, 164 (Bankr.D.Minn.1985). Proceedings for constructive civil contempt are not among these exceptions. The only one that could conceivably apply is that of § 362(b)(1): "the commencement or continuation of a criminal action or proceeding against the debtor." That provision, obviously, would afford an exception from the automatic stay—but only for formal proceedings for *criminal* contempt. As the Defendants acknowledge, they obtained the bench warrant to com-

pel the Debtor's attendance before a judge of the state court on their clients' motion to compel discovery. Ultimately, they sought to force his attendance at a deposition in litigation between private parties. They did not seek or obtain the warrant to vindicate the state court's authority by punishing him for his past violation of its order. This is the telling distinction between civil and criminal contempt. *E.g., Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988); *United States v. United Mine Workers*, 330 U.S. 258, 303–304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911).

Ultimately, the breadth of § 362(a)(1) drives the conclusion to this issue, as to the automatic stay. Under this provision's language, a debtor in bankruptcy is protected from the "commencement or continuation" of *any* "judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [debtor's bankruptcy] case." *See In re Panayotoff*, 140 B.R. 509, 511 (Bankr.D.Minn.1992). Section 362(a)(1) clearly encompasses all claims, causes of action, or rights to any form of civil legal relief that are founded on factual bases that arose pre-petition. "Every proceeding of a judicial or quasi-judicial nature is affected." *In re Joe DeLisi Fruit Co.*, 11 B.R. 694, 695 (Bankr.D.Minn.1981). This has to include proceedings for adjudications of civil contempt, where the act in question is the debtor's alleged pre-petition violation of a court order.

The automatic stay, then, restrains all persons and entities from initiating civil contempt proceedings against a debtor in bankruptcy. It continues to do so until the bankruptcy court grants relief from the stay, or until the stay terminates by operation of 11 U.S.C. § 362(c).

*In re Atkins*, 176 B.R. 998, 1005–06 (Bankr.D.Minn.1994).

The court in *In re Goodman*, 277 B.R. 839, 841–42 (Bankr.M.D.Ga.2001) analyzed the distinction between a civil and criminal warrant as follows:

The automatic stay, which goes into effect upon the filing of a bankruptcy petition, serves as broad protection against interference with the bankruptcy estate. Among its effects is to bar "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the [bankruptcy] case." 11 U.S.C. § 362(a)(2). However, it does not apply to "the commencement or continuation of a criminal action or proceeding against the debtor." *Id.* § 362(b)(1). Therefore, the first step in this analysis is to determine whether the arrest warrant in this case was criminal or civil in nature.

The warrant in this case is in the nature of civil contempt. A contempt order that allows the debtor to purge himself of contempt, as the warrant here does, is civil in nature. *In re Maloney*, 204 B.R. 671, 674 (Bankr.E.D.N.Y.1996). Also supporting a conclusion that the warrant is a civil contempt remedy are the facts that "it was initiated by a private party, to coerce the Debtor's compliance with his duty to provide discovery responses." *Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1007 (Bankr.D.Minn.1994).

As a civil contempt remedy, the arrest warrant would appear to fall within the scope of Section 362(a)(2). However, some courts have held that the civil contempt penalty in question was issued to uphold the dignity of the court and therefore was not stayed in bankruptcy.

*Stovall v. Stovall,* 126 B.R. 814, 816 (N.D.Ga.1990); *Rogers v. Overstreet (In the Matter of Rogers),* 164 B.R. 382, 391–92 (Bankr.N.D.Ga.1994). The warrant in this case specifically states that it is issued for that purpose. But it is also being used as a coercive tool to enforce a judgment, as evidenced by the fact that Debtor could purge himself of the contempt by complying with the March 27 order. *See Siskin v. Complete Aircraft Servs., Inc. (In re Siskin),* 231 B.R. 514, 519 (Bankr.E.D.N.Y.1999). The very fact that it was issued at Albany's request also suggests that its purpose is to enforce a judgment. *Mitchell Constr. Co. v. Smith (In re Smith),* 180 B.R. 311, 319 (Bankr.N.D.Ga.1995); *Atkins,* 176 B.R. at 1006.

Albany would have this Court dissect the purposes behind the warrant and hold that to the extent it is used to force Debtor to comply with their efforts to enforce a judgment, it is controlled by the automatic stay, but to the extent it issued due to Debtor's disregard for the authority of the superior court, the automatic stay does not apply. However, these purposes are inextricably intertwined and cannot be severed. Debtor may purge his contempt and avoid incarceration by answering interrogatories and paying the attorney fees. Albany's position would require Debtor either to forego the option of purging contempt or to forego the protection of the automatic stay. Therefore, even if the warrant were based on Debtor's disrespect for the superior court, it is still being used as a collection device. As a result, the Court concludes that the arrest warrant is covered by the automatic stay.

The court determines that the bench warrant issued by the Lake Superior Court is civil in nature, and is thus subject to 11 U.S.C. § 362(a).

Next, if a warrant is found to be civil in nature, what is a creditor's duty as to a warrant issued pre-petition, given the automatic stay? In other words, as this issue pertains to the case currently before the court—does the creditor violate the automatic stay by failing to take affirmative action to halt the effect of the bench warrant issued pre-petition? In the matter of *In re Baldwin,* 1996 WL 33401577 (Bankr.C.D.Ill.1996), the state court issued a pre-petition contempt citation to the debtor for failing to pay child support, and ultimately issued a bench warrant. The debtor subsequently filed bankruptcy and the warrant was never recalled, which resulted in the debtor spending three days in the county jail. The court stated:

> Based on [the] language of 362(a)(1) many courts have emphasized the obligation incumbent upon creditors to take the necessary steps to halt or reverse any pending State Court actions or other collection efforts commenced prior to the filing of a bankruptcy petition, including garnishment of wages, repossession of an automobile, foreclosure of a mortgage or a judgment lien and, thereby, maintain, or restore, the status quo as it existed at the time of the filing of the bankruptcy petition. (Citations.) This responsibility is placed on the creditor and not on the debtor or the trustee as the defendants suggest because "[t]o place the onus on the debtor, ... to take affirmative legal steps to recover property seized in violation of the stay would subject the debtor to the financial pressures the automatic stay was designed to temporarily abate, and render the contemplated breathing spell from his creditors illusory". Further, it would result in a significant waste of judicial resources and "the automatic stay at 11 U.S.C. § 362 would be frustrated if the debtor had to involve the court in each

situation as here. It would continuously involve the court in pointless and needless litigation. In the facts of the case it should not be the court that should stop the snowball." (Citation.)

The court in Miller, [22 B.R. 479] at 481 notes,

The courts have been quick to realize that creditor inaction can often be as disruptive to the debtor as affirmative collection efforts. (Citation.) In recognition of this problem, creditors have been required, when necessary, to take affirmative steps to restore the status quo at the time of the filing of the petition for relief.

The court finds the defendants argument that the Sheriff had "constructive possession" of the property and acted pursuant to the order of the Common Pleas Court and not the order of the defendants unavailing. The provisions of the automatic stay place the responsibility to discontinue any pending collection proceedings squarely on the shoulders of the creditor who initiated the action. The *Elder* court [12 B.R. 491 (Bankr.M.D.Ga.1981) ] aptly stated that the "[c]reditor sets in motion the process. The creditor is in the driver's seat and very much controls what is done thereafter if it chooses. If the 'continuation' is to be stayed, it cannot choose to do nothing and pass the buck to the garnishee or the court in which the garnishment is filed to effectuate the stay. Positive action on the part of the creditor is necessary so that 'continuation' is stayed." (Citation.)

*In re Baldwin,* 1996 WL 33401577 *3

The foregoing analysis is a prevailing theme in other bankruptcy courts as well. For instance, in *In re Daniels,* 316 B.R. 342 (Bankr.D.Idaho 2004), a bench warrant was issued pre-petition for the debtor's failing to turnover tax returns and the

creditor's refusing to recall the bench warrant. The court flatly rejected the creditor's contention that it was the state court which issued the bench warrant such that it was the only one who could quash it.

When Debtor filed for bankruptcy relief, *any* further proceedings in the state court action were unconditionally stayed by operation of federal law. That would obviously include any efforts to enforce the state court's arrest warrant. The issue raised in this case is whether, in failing to take steps to stop those proceedings, Creditor or Counsel violated the automatic stay. Without deciding whether a state court may ever punish a debtor for civil contempt for violating its orders in a collection action after the debtor files a bankruptcy petition, the Court declines to accept Creditor's strained view of the issues. The simple facts suggest otherwise.

Here, Creditor initiated the process that culminated in the state court issuing a warrant for Debtor's arrest. Creditor filed the state court collection action against Debtor and secured a money judgment against him. Creditor followed up with post-judgment collection proceedings. Specifically, when Creditor's judgment against Debtor went unpaid, Creditor sought information about Debtor's financial affairs. Understandably, copies of Debtor's tax documents would have been helpful to Creditor to garnish Debtor's wages or seize his assets. But when Debtor failed to produce some of the requested information, Creditor asked the state court to put Debtor in jail. It was Creditor that sought entry of a warrant for Debtor's arrest, even to the point of drafting the arrest warrant. In other words, this entire scenario was created, produced and directed by Creditor, not the state court.

Creditor's strategy in this case was nothing new nor was it based upon anything distinctive about Debtor's conduct. It was Creditor's routine practice to seek a warrant in such cases, and if a debtor was arrested and bail was posted, to ask the state court to give it the cash in satisfaction of its claim. At that point, it was clear Creditor no longer wanted just information; it wanted money. To avoid incarceration, Debtor was required to post bail, in cash, in the exact amount of the judgment. The question for Debtor became "should I pay the judgment or should I go to jail?" To this Court, it is clear that Creditor's efforts to get Debtor put behind bars were "calculated to enforce a money judgment, pursue a 'collection motive,' [and] to harass" Debtor. *In re Lincoln,* 264 B.R. 370, 374 (Bankr.E.D.Pa.2001). Requiring Debtor to either pay up or lose his freedom is a choice the Bankruptcy Code was designed to eliminate.

Creditor's use of the state court contempt proceedings was in furtherance of its collection action. And even though the arrest warrant was issued prebankruptcy, maintenance of that collection action in the form of the potential enforcement of the arrest warrant was prohibited by operation of the automatic stay once the bankruptcy case was commenced. *Eskanos & Adler, P.C.,* 309 F.3d at 1215 ("The maintenance of an active collection action alone adequately satisfies the statutory prohibition against 'continuation' of judicial actions."). *See also Guariglia v. Cmty. Nat'l Bank & Trust Co. (In re Guariglia),* 382 F.Supp. 758, 761 (E.D.N.Y. 1974) (fording that the creditor's post-judgment contempt action against the debtor for failing to answer interrogatories was, in reality, a collection method

when the fine imposed was in the exact amount of the judgment).

*In re Daniels,* 316 B.R. at 348–49.

The *Daniels* court then went a step further and found that creditors have a broad **duty** to take steps post-petition to undo previous collection activity:

> Here, after Debtor filed for bankruptcy, Debtor asked Creditor to act to protect him from arrest. Creditor refused. Instead, Creditor sought to shift the duty to quash the warrant to Debtor, the state court, or to the police by asserting it was the "court's warrant," and by telling Debtor it had no responsibility to withdraw the warrant. The past decisions of this Court clearly criticize this attitude.

> In *In re Johnson,* 262 B.R. 831, 847 (Bankr.D.Idaho 2001), the sheriff seized literally all of the debtor's personal property at the request of a creditor before the debtor filed for bankruptcy. After bankruptcy, the creditor insisted that it was the debtor's burden to secure the release of the property to debtor from the sheriff. When the debtor challenged the creditor's position in this Court, it held that the creditor, not the sheriff, bore the duty to secure a stay in the state court proceedings and to restore the debtor's possession of the seized property. *Johnson,* 262 B.R. at 847. This Court explained:

> > Creditors and their counsel are not allowed to sit by and watch the litigation they have commenced proceed by shifting responsibility to local authorities charged with collecting judgments obtained through their efforts ... 'The provisions of the automatic stay place the responsibility to discontinue any pending collection proceedings

squarely on the shoulders of the creditor who initiated the action . . .'

*Id.* at 350.

Many parallels can be drawn between the foregoing cases and the matter pending before the Court. Without question, the bench warrant issued by the Lake Superior Court is civil in nature. It was issued at Dykstra's request and is a result of Galmore's failure to appear in court to testify as to her non-exempt assets available to satisfy Dykstra's judgment. Secondly, the default judgment entered against the Debtor was for $6,000 plus court costs of $72.00, and the order issuing the warrant set the cash bond in the amount of $6,075.00. Curiously enough, this is almost exactly the amount of the debt. There is no doubt that if this amount was paid, the warrant would have been recalled. Furthermore, there is nothing in the record, or on the face of the warrant itself, which remotely indicates that it was issued to uphold and preserve the "dignity" of the Lake Superior Court. It was not the court who wanted Galmore to appear—it was Dykstra.

More disturbing is that Galmore, *even after filing bankruptcy,* was at risk—even during something as mundane as a routine traffic stop—of being arrested, placed into custody, and then forced to post a cash bond in the amount of a pre-petition debt in order to secure her release. More pointedly, as actually occurred, Galmore was at risk of being arrested [8] on a state court "collection device" bench warrant during her appearance at her § 341 meeting, an appearance mandated by the federal law of the Bankruptcy Code. This is completely contrary to the purpose of the Bankruptcy Code and has the effect of rendering § 362(a) ineffective as to Dykstra's debt. The circumstances in this case

raise the issue of whether a creditor, or an attorney, who has notice of a bankruptcy filing and had previously caused a bench warrant to be issued in order to collect a debt, has an affirmative duty to request that the warrant-issuing court recall the warrant. The court determines that this affirmative duty should be imposed. Although not developed by Galmore's counsel as a theory of liability, pursuant to Fed. R. Bank. P. 7054(a)/Fed. R. Civ. P. 54(c), the court determines that Dykstra violated 11 U.S.C. § 362(a) by his failure to take any steps to recall the Lake Superior Court's bench warrant upon receipt of notice of Galmore's filing of her bankruptcy case.

The court determines that Dykstra's failure to take action to seek to "recall" the Lake Superior Court's bench warrant violated 11 U.S.C. §§ 362(a)(1), 362(a)(2) and 362(a)(6).

But the issue under 11 U.S.C. § 362(k) is whether Dykstra's actions were willful, and the court—although sending a message in this decision of its expectation as to recalling bench warrants issued as a collection enforcement tool—will not determine Dykstra's "willfulness" based upon his failure to recall the warrant. However, depending upon the facts of a particular case, future creditors in the position of Dykstra may not be so fortunate, given the court's pronouncement.

The crux of the issue in this case is whether Dykstra's conduct at the § 341 meeting on September 11, 2007—in relation to the outstanding bench warrant—constituted a willful violation of the stay.

Dykstra's frustrated attitude toward Galmore arising from the course of the proceedings in the state court—an attribute of his subjective intent—is attested to by the following:

**8.** Let's be clear: Galmore was placed under arrest when she attended her § 341 meeting.

Q: And were you able to successfully collect any money from Miss Galmore?

A: No.

Q: That—would you describe your experience before the Lake Superior Court with Miss Galmore as frustrating?

A: Very much so.

Q: And were you never able to collect any money and it was a rather frustrating experience?

A: No, I never collected a dime, no.

Trial Transcript, Direct Examination of Dykstra, p. 13: 3–8

Dykstra's testimony is that he merely appeared for the § 341 meeting, and when asking for directions a court security officer noticed the warrant:

Q: And when you came to this courthouse, you alerted the security people at the front that there was a warrant for Miss Galmore's—what you referred to as arrest; is that correct?

A: No.

Q: But you did show them that warrant that you had?

A: I didn't show them the warrant, I showed them a stack of papers I had because when I first came in I was lost, I didn't know where—I didn't know you entered this place on the second floor. I thought—I went though the security and what—not and I had my papers, I didn't show them my papers at all. I figured the number is going to be on the door so I walked around a couple times and couldn't find where I was supposed to be so then I went back to those—the security men in the front.

Q: And you did show them that you had a, we'll refer to it as, a Bench Warrant from Lake Superior Court?

A: What I showed them was all of my paperwork that attorney Lawhead had put in chronological order as I—as we had this case from over a year ago. The very top copy was for the bankruptcy hearing.

Q: Uh-huh.

A: The day I was supposed to be here, the time and what room. The next thing was the last thing I received before that was a copy of a Bench Warrant. So I gave them my papers and I said, Gentlemen, I'm lost, I can't find the room. He took it and looked at it and then he looked at the next paper and he said, you have a Bench Warrant. I said, Yes, I do. Well, when I said that, another one of the guys there, another one of the security men in blue came and stood right next to me. He said, You have a Bench Warrant? I said, Well, this is a copy, it's not for me, it's for the lady that's downstairs and I'm going to see in the Bankruptcy hearing. And the first man said, Did you see her? I said, Yes, she walked in ahead of me and I seen here come in but I haven't seen her since. And he immediately got on a walkie-talkie, called whomever, the marshals and three men were there in like 20 seconds. He had the copy of the Bench Warrant in his hand. He handed it to the marshal and said, There's a Bench Warrant for this lady; she's at this hearing today, and they took off. And there I'm standing. And then from that point on, I never had the Bench Warrant again, they just took it from me.

Q: You were never told by your counsel or anyone else to show that to people at the courthouse?

A: Not per se, not just the Bench Warrant. I was supposed to show them all my papers and I think it was a judge or officer at this bankruptcy proceeding.

Trial Transcript, Direct Examination of Dykstra, p. 14:3–16:3.

When questioned further at trial the Defendant stated:

Q: Now, Mr. Dykstra, on that tape or during that hearing [the § 341 meeting] I think you were—you were kind of blaming everyone; you blamed your attorney that told you to come here that day and that you were supposed to present those documents to the front; is that correct?

A: No, that's not correct. I didn't—I'm not blaming anyone for anything. The gentleman that was running that hearing asked me some questions and I—and the best I could, I tried to explain to him what I thought I was supposed to do. I had no knowledge really what was going on. I've never been involved in this before in my life.

Q: Well, Mr. Dykstra, you said you had no knowledge of what was going on, you were represented by counsel and you did receive the bankruptcy notice from the court; is that correct?

A: I received a copy of it from Ed, from my attorney. The court itself, I don't think sent me a copy of it but I did have a regular copy. And when I first entered this building, my attorney said present all these papers when I go to this hearing. Now when I came in, I had never been in this building up until that time, I thought those men in blue were marshals, I didn't know they were just—well, not just but that they were security people, I didn't know that.

THE Court: They're court security officers is technically what they're called.

A: Okay. And I thought they were marshals. And he told me when I came in that I would—at that hearing I was supposed to bring this—all of my paperwork with me. Again, that was the second from the top item because the top item was the day I was to be here and what it was for and what time, and that was the second item.

So when I gave it to those men, I didn't give it to them to say—to arrest a person or to say I've got a Bench Warrant for a person. Honestly, I don't want her arrested, I don't want to jeopardize here job because what I wanted was the $6,000 she owed me. I don't want her in jail. I just wanted to go through the bankruptcy hearing and hopefully get my money back or get some of my money back.

BY MR. DABERTIN:

Q: Now that—

A: And they took it from me and that was it, I never had a—

Q: That bankruptcy notice told you not to take further actions against the Debtor though and you understood that?

A: And I didn't; they did.

Trial Transcript, Direct Examination of Dykstra, p. 19:19–21:17.

This is quite an interesting chain of events. Dykstra testified that he was told by his attorney to bring all his "paperwork" to the first meeting of creditors. This paperwork happened to include a bench warrant, stating a cash bond amount

equal to the amount of the debt. When asking for directions to the hearing, Dykstra handed the court security officer (who directs countless debtors to the 341 meeting room on a weekly basis) his papers. The officer was then overtaken by a sudden sense of curiosity, thumbed through the stack, and found the order issuing the warrant. At that point, according to Dykstra, the wheels were in motion for the execution of a warrant with which he had nothing to do.

The court doesn't find this version of events to be credible. Instead, the court determines that Dykstra attended the § 341 meeting with the intent of causing the execution of the warrant in order to then use the Debtor's incarceration as leverage to collect his debt, or at least to punish Galmore for not paying the debt. The Transcript of the § 341 meeting clearly demonstrates that Dykstra, and perhaps his attorney, do not understand the purpose of the bankruptcy process:

> Dykstra: Um, the only question I have is whatever assets you have, how do you intend on paying me the judgment against you?
>
> Debtor's Counsel: Answer you don't
>
> Galmore: I don't
>
> Dykstra: So you just want to file bankruptcy and then you're clear-is this how this works?
>
> Trustee: That's the purpose of filing a bankruptcy, is, uh, generally, all the people and creditors that she listed, that's what she's attempting to do is to get a discharge of debt and that means she ain't gonna pay you, okay, plain and simple ...

Recorded Transcript of § 341 Meeting

But more damaging to Dykstra's position are the following statements made at the § 341 meeting, which clearly contradict his trial testimony:

> Trustee: Sir, do you have uh do you have law enforcement officials ready to serve this uh—
>
> Dykstra: I was told by my attorney that when I entered here I would go through U.S. Marshals *and to show them the arrest warrant.*
>
> Trustee: Okay
>
> Debtor's Counsel: It's not an arrest warrant, it's a bench warrant.
>
> Dykstra: Whatever, again I'm unfamiliar with the court—a bench warrant, okay.
>
> Dykstra: *So I showed it to them and he expects her to be arrested.*
>
> Debtor's Counsel: Who, your attorney?
>
> Dykstra: That's what he told me

Recorded Transcript of § 341 Meeting (emphasis supplied)

These statements leave no question in the court's mind that Dykstra's trial testimony was engineered. The purported encounter with the Court Security Officers occurred within a short period of time before Dykstra's questioning of the Debtor at her § 341 meeting. Nowhere in the recorded § 341 meeting transcript does Dykstra make any indication that he did not want Galmore arrested, nor that it was not his intent to show the court officials the warrant. To the contrary, he clearly stated, "So I showed it to them ...". To make matters worse, and to totally call his veracity into question, upon cross-examination by his own attorney at trial, Dykstra disingenuously contradicted his statements made at the § 341 meeting:

### CROSS–EXAMINATION

BY MR. LAWHEAD:

Q: Ed, was it your intent to have Miss Galmore arrested on that day when you appeared for the Meeting of Creditors?

A: Not that day or any other day.

Q: What were your intentions on that day as far as coming to the Meeting of Creditors?

A: My hope was that we would go through this bankruptcy hearing and they would see all the evidence and see that every—practically every court date she did not come to, she would not participate, *and they would rule in my favor that she did owe me this money, even though she's filing bankruptcy.* And I don't understand how it works but I'm told that or I hear you get maybe a portion of the money that's owed you. I was hoping to get whatever they were willing to give me.

Q: Now did I personally at any time instruct you to attempt to execute that Bench Warrant at that Meeting of Creditors?

A: No, no, you didn't. On that tape I—I did miss—*I did misspeak on that tape* because there's a—

Q: In what way? In what terms?

A: *There's a time when I said—I don't know if I called you by name or said my attorney said to give this—give this Bench Warrant to the marshals or something.* Me thinking the marshals were the men in the front there but want I was supposed to do was give all my paperwork and that's what I meant but at the time her attorney was speaking specifically of that Bench Warrant and *I said, Yeah, I was supposed to give this to the marshals, but I said that in the context, I was supposed to give that with all the other paperwork to the people there.*

Q: And did you at any time on that day, September 11th of 2007, personally seek the assistance of the U.S. Marshals to go and execute this Bench Warrant against Miss Galmore?

A: I never spoke to a U.S. Marshal except at the very end to ask them if I could leave because I had to go back to work and before that I had to take my mother to a medical—

Q: So it is—

A: —procedure.

Q: —so is it your testimony today that you did not personally seek the assistance of the U.S. Marshals to execute the Bench Warrant?

A: No, and I never did. *I gave it to the security man, he seen it.* After he took the top sheet off the stack, he looked down and seen it and he says, again, like I said earlier, he asked, What is this Bench Warrant? Is this your Bench Warrant? I said, *Yes, that's mine, but it's not for me, it's for the lady downstairs. He said, Did you see her? I said, Yes, she walked in before I did and—but I don't know what room it is. I was still looking for the room at that time.*

He never said another word to me, he just gets on the walkie-talkie, he makes a call; boom, these three big guys are there in yellow shirts and he said, There's a Bench Warrant for a lady in room whatever, 1700 or something, I forget what it is now. They left and left me standing there, that was it. I never seen the Bench Warrant again. No one discussed it with me, no one said boo to me.

MR. LAWHEAD: Okay, I have nothing further, Your Honor.

Trial Transcript, Cross–Examination of Dykstra, p. 22:2–24:15 (emphasis supplied)

In other words, at the trial Dykstra stated that he was "supposed" to give the bench warrant to the officials in the front

of the building. Whether those officials were U.S. Marshalls or Court Security Officers is immaterial: Dykstra intended to bring the warrant to the attention of law enforcement personnel who could "arrest" Galmore on the bench warrant. And that is exactly what he did. This is inconsistent with other parts of his testimony in which he testified that he handed all his papers, without comment on his part, to the Court Security Officer who then happened to discover the warrant.

Another interesting tidbit in the above cited cross-examination is Dykstra's testimony that:

> After he took the top sheet off the stack, he looked down and seen it and he says, again, like I said earlier, he asked, What is this Bench Warrant? Is this your Bench Warrant? I said, Yes, that's mine, but it's not for me, it's for the lady downstairs. He said, Did you see her? I said, Yes, she walked in before I did and—but I don't know what room it is. I was still looking for the room at that time.

Trial Transcript, Cross–Examination of Dykstra, p. 24

Thus, Dykstra pointed the CSO in the direction of Galmore, which is inconsistent with his assertion that he did not want to see her arrested. Due to the foregoing inconsistencies between Dykstra's trial testimony and the recorded § 341 transcript, and the lack of a clear explanation as to those inconsistencies, the Court affords no weight to Dykstra's trial testimony and concludes that the transcript of the § 341 meeting provides the most accurate representation of the events that transpired. As demonstrated by the audio recording of that meeting, Dykstra was not at all sensitive to any potential violation of the automatic stay, nor did he make any statement at the meeting of creditors that the warrant fell into the hands of federal law enforcement personnel by mere happenstance. It is clear that it was Dykstra's intent to appear at the § 341 meeting to have Galmore arrested as either punishment for not paying the debt and/or as a method to attempt to collect the debt. Therefore, the court find that the actions of Dykstra on September 11, 2007 both violated the automatic stay and were willful under 11 U.S.C. § 362(k).

█ As far as damages are concerned, for whatever reason Galmore failed to personally appear at trial to testify as to the actual damages she incurred as a result of Dykstra's violation of the stay. Despite that, this is a case where the court finds that punitive damages are warranted. The § 341 transcript demonstrates that Dykstra's actions were intentionally taken in violation of 11 U.S.C. §§ 362(a)(1), 362(a)(2) and 362(a)(6)—actions which both disrupted a § 341 proceeding under the Bankruptcy Code and were in clear disregard of the automatic stay, despite the repeated warnings of debtor's counsel. While the warrant was recalled that same day, that recall was due primarily to the efforts of Galmore's counsel: Dykstra made no effort to contact his attorney and was not at all concerned about the possible ramifications of his actions. The court intends to send a clear message that this type of conduct will not be tolerated and finds that punitive damages in this case are clearly warranted. As to the amount of damages, at trial the parties reached a stipulation that damages would be limited to $1,100, stated as follows on the record:

> MR. DABERTIN: Your Honor, we would stipulate that in the interest of justice that if the Court finds liability on behalf of the Defendant in this case that it award no sanctions; however, we have stipulated that the Plaintiff would be allowed five and a half hours

at $200 an hour for fees and that is if the Court finds liability only.

THE Court: So the maximum, if I did find a violation of 11 U.S.C. Section 362, that I could award the Plaintiff/Debtor would be $1100?

MR. DABERTIN: That would be correct, Your Honor.

THE Court: Ed, is that correct?

MR. LAWHEAD: No Objection, Your Honor, that's correct.

THE Court: Okay. And that stipulation is accepted as the cap for any determination of damages or other potentially awardable amounts under 11 U.S.C. Section 362(k).

\* \* \*

MR. DABERTIN: Your Honor, just— I—just want to clarify on our stipulation, I just want to make it clear that if Your Honor does find outrageous behavior, that it can find that finding of fact. We are limited by that stipulation. I just don't want the opinion to come out and say somehow we roll, we're just stipulating to that amount, it does not reflect in any way the strength of our case.

THE Court: I understand that. You're in essence, no matter what I would find as to a conclusion of law as to the violation of 362(as), I—you aren't waiving any punitive damages—

MR. DABERTIN: That's correct, Your Honor.

THE Court: —is the way I understand the stipulation to work. And if I do find a violation, then the maximum amount I could award to you is $1100?

MR. DABERTIN: That's correct, Your Honor. And, again, it's just—that's perfect. It does not go to the weight of our case, it's just a matter of stipulation that counsel and I have worked

out for reasons we chose not to disclose to the court.

Trial Transcript, p. 40:19–41:11; p. 42:1–21

Galmore proved no compensatory damages. 11 U.S.C. § 362(k)(1) authorizes an award of attorney's fees. Although the court finds that punitive damages are warranted, damages are limited by the foregoing stipulation. Galmore is hereby awarded attorney's fees in the amount of $1,100.00, pursuant to 11 U.S.C. § 362(k)(1).

IT IS ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of the Galmore, and against Dykstra, for attorney's fees in the amount of $1,100.00.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Galmore's request that Dykstra be enjoined from any further action in violation of 11 U.S.C. § 362 as to the foregoing pre-petition debt is DENIED as inappropriate relief in light of the entry of her discharge: that requested relief is now within the scope of 11 U.S.C. § 524(a).